No. 47,957

STATE OF KANSAS, *Appellee*, v. JERRY D. GORDON, *Appellant.*

(549 P. 2d 886)

644

Opinion filed May 8, 1976.

*Gwinn G. Shell,* of Garnett, argued the cause, and *Charles S. Fisher, Jr.,*

and *Robert D. Ochs*, of Fisher, Ralston & Ochs, of Topeka, were with him on the brief for appellant.

*Terry Jay Solander*, county attorney, argued the cause and *Curt T. Schneider*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

FATZER, C. J.: This is an appeal by the defendant Jerry D. Gordon from convictions, following trial by the district court, for driving while intoxicated (K. S. A. 8-530), transporting an open container of alcoholic beverage (K. S. A. 41-804) and two counts of vehicular homicide (K. S. A. 21-3405).

The two-car head-on collision giving rise to the defendant's conviction occurred between 1:00 and 1:15 a. m. on the morning of Sunday, June 16, 1974, some fifteen miles west of Garnett on a blacktop highway commonly called the Burlington Road. The accident occurred at the bottom of a slight hill. Looking west from the point of impact, one can see approximately 440 yards; looking east, one can see approximately 260 yards. The road had no center line and was 23 feet wide. The defendant was driving east, returning to Garnett after taking his date to her home near Westphalia. The driver of the other car, Randy Rugg, was going west taking his date, Kathy Frank, to her Westphalia home.

The evidence showed that when the cars were slightly more than 60 feet apart, each was on the wrong side of the road, left of center. The front right tire of each car was exactly in the middle of the road. One tire of each car left "scuff marks"—tire marks made by a hard braking turn, extending back about 30 feet from the approximate point of impact. The cars collided on the defendant's side of the road, seven feet in from the south edge. At the approximate point of impact, the defendant's car was headed in an east-southeasterly direction; the Rugg vehicle, in a west-southwesterly direction. The defendant's car struck the Rugg car on the right front fender angling toward the driver. A substantial portion of the front end and right side of the Rugg car was compressed to the right front seat. Damage to defendant's car was less extensive and was limited to the right front portion.

Kathy Frank was apparently killed instantly; Randy Rugg was later to die in the ambulance on the way to the hospital; the defendant sustained facial lacerations and was found lying in the front seat of his car in an unconscious condition when law enforcement officers arrived at the scene at approximately 2:15 a. m. The

defendant was subsequently taken by ambulance to the hospital in Garnett where he spent the night and was released the next day.

A sample of the defendant's blood was taken while he was at the hospital. The blood alcohol test showed his blood alcohol content to be 0.15 percent. Samples of blood and other body fluids were also taken from the two decedents by the deputy district coroner, Dr. Leitch. Tests were negative for alcohol, but showed both decedents had barbiturates in their bodies. The test indicated the presence of the drugs, but not their concentration. The barbiturates detected induce sleep and allay nervousness and can be obtained only by prescription.

At the scene of the accident, two open liquor bottles were found on the floor of the defendant's car. No containers were found to indicate the source of the drugs detected in decedents' bodies. The evidence did not reveal where the decedents got the drugs, only that the Rugg family doctor had not prescribed them.

On the evening prior to the accident, the defendant and his date went to a dance in Garnett. During a three-hour period at the dance the defendant consumed about one-half pint of Scotch. When the dance was over at 12:00, he drove his date home. She testified she noticed nothing unusual about the way defendant acted or the way he drove. Leaving his date's home at 1:00 a. m., defendant started back to Garnett. He was tired and, wanting to take the shortest route home, he selected the Burlington Road. He remembered meeting one car. The next thing he remembered was seeing two headlights coming at him. He remembered little that happened after the accident. Although he remembered having a blood sample taken, he could not recall any of the conversation or circumstances in connection with it.

There was some conflicting testimony concerning the activities of the decedents on the evening prior to the accident. Randy Rugg's family testified Randy and Kathy spent the evening at the Rugg home until about 1:15 a. m., when they left for Kathy's home.

There was other testimony that Randy and Kathy had been seen earlier that evening at "the Spot," and they were seen driving around the lake between 12:00 and 1:00 a. m. on that morning.

At a trial on October 3, 1974, after the state's opening statement and before the first witness was called, stipulations which the state and defendant had entered into were read into the record with the approval of both parties. After the state and defendant had presented their evidence and rested, the court took the matter

under advisement and directed both parties to submit briefs. The defendant raised in his brief, for the first time, the issue of his blood test's admissibility. He contended evidence of his blood alcohol test was inadmissible under the rule of *State v. Brunner*, 211 Kan. 596, 507 P. 2d 233, because it was the result of an impermissible search.

On November 1, 1974, the parties again came before the court for entry of judgment. At this proceeding, the court, prosecutor and defense counsel had an extensive discussion on the admissibility of defendant's blood alcohol test. At the close of the discussion, the court ruled the test was properly in evidence and rendered the judgment and sentence from which the defendant appeals.

The defendant's first point on appeal is that the district court erred in considering the results of his blood alcohol test. We agree.

In *State v. Brunner*, supra, we considered whether the taking of a blood sample from a person suspected of driving while intoxicated was an unreasonable search and seizure in violation of Fourth Amendment protections. The general principles of law recounted there govern the instant point on appeal. The Fourth Amendment and Section 15 of the Kansas Bill of Rights guarantee the people security against unreasonable search and seizure of their persons. The taking of a blood sample from a person suspected of driving while under the influence of intoxicating liquor is a "search" within the meaning of the foregoing provision. Under our "implied consent statute" (K. S. A. 8-1001), a person operating a car on a public highway in Kansas is deemed to have consented to such a search:

". . . [W]henever he or she shall be arrested or otherwise taken into custody for any offense involving operating a motor vehicle under the influence of intoxicating liquor . . . and the arresting officer has reasonable grounds to believe that prior to arrest the person was driving under the influence of intoxicating liquor. The test shall be administered at the direction of the arresting officer. . . ."

However, the provisions of this statute become operative only after a person is arrested or otherwise taken into custody. Before arrest, a person may voluntarily agree to a blood test, but is free to refuse. Absent voluntary consent there is no valid waiver of an accused's constitutional rights against unreasonable search and seizure.

Here, the appellant's blood sample was taken before he was arrested or in custody. Therefore, whether the taking was an impermissible search turns on the voluntariness of the appellant's consent.

The blood sample was taken approximately two and one-half hours after the head-on collision. One and one-half hours before the sample was taken, law enforcement officers found the appellant unconscious, with facial lacerations, lying in the front seat of his car. He was subsequently taken by ambulance to the hospital in Garnett where Dr. Leitch, the deputy district coroner, first saw him lying on the emergency room table. Minutes after Dr. Leitch arrived at the hospital from the accident scene, he instructed the appellant that blood should be drawn for a blood alcohol determination. Dr. Leitch testified the appellant appeared lucid at the time. The appellant remembered a blood sample was taken, but could recall none of the surrounding circumstances or conversation. In fact, it was not until Dr. Leitch testified at trial that the appellant realized that his blood sample had been taken before he was arrested by the highway patrol trooper. The trooper arrived at the hospital approximately one-half hour after the blood sample had been taken. He testified that when he first saw appellant at the hospital, he appeared to be in a semiconscious state. After he was revived, the trooper advised him a blood sample had been taken and placed him under arrest.

From the foregoing evidence, we are of the opinion it cannot be said the appellant voluntarily consented to the taking of his blood sample.

The state argues that Dr. Leitch took appellant's blood sample acting as a private citizen; therefore, Fourth Amendment proscriptions are not applicable. From our reading of the record, however, we believe the doctor was acting as an agent of the state—as deputy district coroner.

The Fourth Amendment prohibition against unreasonable searches and seizures applies solely to governmental action, not to the acts of private individuals. *Burdeau v. McDowell*, 256 U. S. 465, 65 L. Ed. 1048, 41 S. Ct. 574 (1921); 79 C. J. S. *Searches and Seizures* § 5 (c).

"The *Burdeau* rule has withstood the development of the exclusionary rule and has gained the strength of over fifty years of acceptance. . . . [T]he effect of *Burdeau* is . . . to admit evidence obtained through private conduct, regardless of the legality of the search or seizure. . . ." Beeson & James, *Searches by Private Individuals: Admissible Windfalls*, 15 AFJAG L. Rev. 91, 100-101 (1973).

See Annot., 36 A. L. R. 3d 553 (1971).

A deputy district coroner is a public officer whose primary duty is to determine the cause of death of a person dying from other

than natural causes. K. S. A. 19-1031; See 18 C. J. S. *Coroners* §§ 1, 12. Whenever a person dies under conditions specified by statute, the coroner is to be notified (K. S. A. 19-1031). Upon such notification, the coroner is to take charge of the dead body, make inquiries regarding cause of death and reduce his findings to a written report. (K. S. A. 19-1032.) It is within his discretion to conduct an autopsy. (K. S. A. 19-1033.)

In the early morning hours of June 16, 1974, Deputy District Coroner Leitch was notified of an automobile accident resulting in at least one death. In his capacity as deputy district coroner, he drove to the accident scene. His coroner's report on cause of death sets forth his findings at the scene. He reported there had been a head-on collision, and Kathy Frank was dead in the front seat of the Rugg vehicle. He observed empty beer cans in appellant's car and reported the highway patrol trooper at the scene was holding two liquor bottles found in appellant's car as evidence. While still at the accident scene, Dr. Leitch received notification through the sheriff's department that the driver of the vehicle containing the dead girl was dead on arrival at the hospital. Dr. Leitch released the body of the dead girl to the funeral director and, still acting as deputy district coroner, drove to the hospital. His coroner's report indicated he first saw the body of Randy Rugg in the hospital emergency room. He also found appellant in the emergency room. Minutes after arriving at the hospital emergency room, he directed that a sample of appellant's blood be taken. Shortly thereafter, and still acting as deputy district coroner, Dr. Leitch went to a local funeral home where he performed an autopsy on both decedents. At trial, Dr. Leitch was called to testify in his capacity as deputy district coroner.

In deciding whether Dr. Leitch took the appellant's blood sample acting as a private individual or as an agent of the state, we think *Commonwealth v. Tanchyn*, 200 Pa. Super. 148, 188 A. 2d 824, *cert. den.* 375 U. S. 866 (1963), is instructive. There, the defendant was the sole survivor of an automobile accident. He was admitted to the hospital and a blood sample was taken in the course of treatment. The hospital conducted several tests on the blood sample to ascertain the condition of and appropriate treatment of the defendant. The next day, the coroner requested the remainder of the blood sample be tested for alcohol. The test was done, the results admitted at trial, and the admission was upheld on appeal in the face of Fourth Amendment attack.

The court's rationale was (1) the blood sample was taken for the benefit of the patient, (2) no agents of the state were present nor did they direct or control the decision of the doctors to take the blood sample, (3) the blood sample had been taken six hours before the coroner requested a blood alcohol test be conducted, (4) the *Burdeau* rule governs.

Applying the above rationale by analogy to the instant case yields contrasting results. The blood sample was not taken for the benefit of the patient, but for the sole purpose of having a blood alcohol test conducted. No medical use was made of the appellant's blood sample; on the contrary, it was sent to a laboratory for a blood alcohol test, and the laboratory was instructed to send the results to the Anderson County sheriff. The coroner himself directed the blood sample be taken. We are convinced the evidence of the blood alcohol test does not fall within the *Burdeau* rule.

Under the facts of the instant case, we conclude that Dr. Leitch obtained the appellant's blood sample acting as deputy district coroner—an agent of the state. Consequently, this "search" was subject to the protection against unreasonable search and seizure guaranteed by Section 15 of our Bill of Rights and the Fourth Amendment to the United States Constitution.

The state argues that because the results of the appellant's blood alcohol test came into evidence by stipulation, he is bound thereby. Further, the state contends that appellant's failure to object at trial to the admissibility of his blood test results now bars the question of admissibility from being considered on appeal.

The stipulation and absence of objection at trial as to the blood test's admissibility appear to have influenced the district court's decision. At the proceedings on November 1, 1974, the court stated:

"Of course, I am also aware, as [the prosecutor] pointed out, the blood test came into evidence by stipulation and I am a little concerned as to, even if it is bad evidence, if it is in by stipulation and the Defendant hasn't raised any objection to it, how can I do otherwise.

"I realize there might be a point at which you wouldn't have this information. I don't think there was any indication on the part of anybody that one was trying to wood shed the other, I don't get that impression at all.

"I might as well go ahead and announce my findings at this point, gentlemen, and there is, of course, time for a new trial for this Defendant if he disagrees."

The pertinent portion of the stipulation which was read into the record at trial with the approval of both parties, is as follows:

"It is further stipulated by and between the parties through their respective

counsel that the results of certain scientific examinations performed upon the blood of the Defendant Jerry Gordon, and the blood, urine, and gastric contents of both Randy L. Rugg and Kathleen A. Frank, the decedents, and as embodied in written form which we now submit to the Court marked State's Exhibit A, *may be admitted into evidence without further identification* by either of the parties *and without objection* of the other *as to the identity or chain of custody of such samples* or specimens which were the subject of the examination.

"And further, that the parties stipulate that such examinations were performed by competent and qualified, properly educated and experienced technicians, using such procedures and techniques as are generally recognized to yield reliable and accurate results.

"And that the contents of the said written reports being, State's Exhibit A, are true and correct." (Emphasis added.)

While it is true that a stipulation freely made is ordinarily binding on the district court and the litigants unless certain circumstances are shown to justify relieving a party from such stipulation (see, *State v. Craven,* 215 Kan. 546, 527 P. 2d 1003; *Morrison v. Hurst Drilling Company,* 212 Kan. 706, 512 P. 2d 438), this proposition is wide of the mark in the instant case. By its express terms, the stipulation is a limited one. The parties stipulated the test results could be admitted into evidence without further identification and without objection as to *identity or chain of custody* of the samples. Counsel entered into the stipulation under the misapprehension that, based on a pretrial interview with the arresting officer, the sample had been taken *after* appellant was arrested. The stipulation did not foreclose objection to the admissibility of the test results on the ground the sample was obtained by an impermissible search. Such an objection was outside the stipulation.

The question then becomes whether the objection was timely. Appellant's memory of the circumstances in connection with the taking of his blood sample was hazy. As indicated, he was not aware before trial that his blood sample was taken before he was placed under arrest. At the trial, through the testimony of the arresting officer and the deputy district coroner, the appellant first learned of the circumstances which he asserts render the taking of his blood sample an impermissible search thereby making the results of his blood alcohol test inadmissible. No objection to the test's admissibility was raised at the trial on October 3. The appellant rested his case late in the afternoon, and the parties agreed to forego final argument at that time. The court took the case under advisement and directed the parties to file briefs. The parties agreed to incorporate their final arguments in the briefs requested

by the court, and were given the prerogative of requesting oral argument at a later time. The appellant first raised the objection to the admissibility of his blood test in his brief filed with the court.

Ordinarily, failure to make timely, specific objection to the admission of evidence will bar consideration of the admissibility question on appellate review. (*E. g.*, *State v. Estes*, 216 Kan. 382, 532 P. 2d 1283; *Baker v. State*, 204 Kan. 607, 464 P. 2d 212; K. S. A. 60-404.) Here, the appellant's objection was not "timely" in the strict sense, but there is no doubt the district court was apprised of the issue before it rendered its decision on November 1, 1974. The issue was raised in appellant's October 22, brief, both parties argued the point at the November 1, proceeding and the court discussed the matter before finally ruling appellant's blood test results were admissible and rendering its decision. What transpired is consistent with the rationale underlying the contemporaneous objection rule—*i. e.* objecting to admissibility and stating the grounds therefore permits the court to preclude improper evidence from affecting the decision. This was a trial by the court; no jurors had been swayed by the improper evidence. The court had not rendered its decision when the issue was raised, and we think under the circumstances of this case the spirit if not the letter of the contemporaneous objection rule was satisfied.

Where, as here, trial is by the court rather than to a jury, on appeal we indulge in the presumption that the district court, in reaching its final decision, considered only evidence which was properly admissible unless the contrary is shown by the record. See *State v. O'Neal*, 204 Kan. 226, 461 P. 2d 801; *State v. Nelson*, 196 Kan. 592, 412 P. 2d 1018; *Mingenback v. Mingenback*, 176 Kan. 471, 271 P. 2d 782; *Heyen v. Garton*, 129 Kan. 453, 283 Pac. 636. See *also United States v. Krol*, 374 F. 2d 776 (7th Cir. 1967); *Moses v. Hudspeth*, 129 F. 2d 279 (10th Cir. 1942). This presumption renders the erroneous admission of evidence harmless because the district court is presumed to be able to put out of its mind things that should not be considered. (See 3 C. Wright, Federal Practice and Procedure—Criminal § 854 [1969].)

In the instant case, the record on its face rebuts this presumption. It is clear from the record the district court did rely on the results of the appellant's blood test in reaching its decision.

In *State v. Fleury*, 203 Kan. 888, Syl. ¶ 2, 457 P. 2d 44, we stated the rule that governs our considerations of federal constitutional error:

"In applying the Kansas harmless-error rule (K. S. A. 60-261 . . .) to a federal constitutional error a court must be able to declare the federal constitutional error had little, if any, likelihood of having changed the result of the trial and the court must be able to declare such a belief beyond a reasonable doubt. (Following *Chapman v. California*, 386 U. S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.)"

Applying this standard, we reach the inescapable conclusion that the erroneous admission of the blood test results was not harmless. Obviously, the test result was itself incriminating. Further, evidence as to the effect of the alcoholic beverages upon appellant's ability to operate his automobile was conflicting, and the test results corroborated what evidence there was that tended to show appellant was intoxicated. Moreover, for purposes of determining whether decedents' deaths were the proximate result of appellant's negligent operation of his vehicle, the blood test evidence weighed against the evidence of drugs found in decedents' bodies and the fact the collision occurred on appellant's side of the road. It is impossible for the court to say beyond a reasonable doubt there is little likelihood the blood test evidence did not change the results of the trial. We are of the opinion the error was highly prejudicial and requires reversal of the convictions for driving while intoxicated and vehicular homicide.

Our conclusion that some evidence tending to show the appellant's negligence was improperly considered by the district court also requires a reassessment of the proximate cause of the decedents' deaths. While contributory negligence is no defense in a prosecution for vehicular homicide, it is a circumstance to be considered along with all other evidence to determine whether appellant's conduct was or was not the proximate cause of decedents' deaths. In some instances, a decedent's contributory negligence may have been a substantial factor in his death and a superseding cause thereof; it may have intervened between a defendant's conduct and the fatal result so as to be itself the proximate cause. (See *State v. Betts*, 214 Kan. 271, 519 P. 2d 655; *State v. Pendleton*, 144 Kan. 410, 61 P. 2d 107; *State v. Custer*, 129 Kan. 381, 282 Pac. 1071, 67 A. L. R. 909; *State v. Bowser*, 124 Kan. 556, 261 Pac. 846; R. Perkins, Criminal Law 614 [1957].)

One further point requires brief comment. The state contends it must prove only simple negligence to convict appellant of vehicular homicide. The appellant argues the statute requires a higher degree of negligence.

K. S. A. 21-3405 reads in part:

"(1) Vehicular homicide is the killing of a human being by the operation of an automobile, airplane, motor boat or other motor vehicle *in a manner which creates an unreasonable risk of injury* to the person or property of another *and which constitutes a material deviation* from the standard of care which a reasonable person would observe under the same circumstances." (Emphasis added.)

We think the Legislature meant something more than simple negligence when it defined the standard of conduct condemned under the vehicular homicide statute.

The vehicular homicide statute (K. S. A. 21-3405) was enacted in 1969 with the wording "substantial deviation." Whether its drafters intended this wording to mean something more than simple negligence need not be decided, because legislative action in 1972 provides a clearer indication of legislative intent. In 1972, legislation was introduced which would have amended the statute by changing "creates an unreasonable risk of injury" to "creates a risk of injury," and by changing "a substantial deviation" to "a deviation." As enacted, the legislation made only one change in the statute; "substantial" was changed to "material." (L. 1972, Ch. 113, § 1.)

We view the change made to the statute in 1972 to be, in essence, no change at all. "Substantial" and "material" have been construed as synonymous terms. *Lewandoski v. Finkel,* 129 Conn. 526, 29 A. 2d 762. The Legislature was presented with language that would have clearly indicated only simple negligence was intended. The Legislature chose not to adopt such language. We conclude that the degree of negligence contemplated by the Legislature in K. S. A. 21-3405 is something more than simple negligence.

From the foregoing, it follows that the cases decided under the negligent homicide statute (K. S. A. 8-529, now repealed, which required only simple negligence) are not controlling in the instant case.

The appellant's conviction for transporting an open container (K. S. A. 41-804) is affirmed. His convictions for driving while under the influence of intoxicating liquor (K. S. A. 8-530) and for vehicular homicide (K. S. A. 21-3405) are reversed and remanded for further proceedings not inconsistent with this decision.

It is so ordered.