**STATE of Minnesota, Respondent,**

v.

**Steven John OEVERING, Appellant.**

**No. 46836.**

Supreme Court of Minnesota.

June 23, 1978.

C. Paul Jones, Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Thomas L. Fabel, Deputy, Richard G. Evans, Spec. Asst. Atty. Gen., St. Paul, Julius E. Gernes, County Atty., Winona, for respondent.

Heard before TODD, SCOTT, and WAHL, JJ., and considered and decided by the court en banc.

TODD, Justice.

This case arises out of a head-on collision between two motor vehicles. Following the accident, Steven J. Oevering, the alleged driver of one of the vehicles, was charged with criminal negligence and several other offenses. Over Oevering's objection, the trial court admitted the blood-alcohol analysis of a blood sample taken from him without his consent in the hospital emergency room. The jury found Oevering guilty as charged. On appeal, Oevering challenges the admission of the blood-alcohol test and the sufficiency of the evidence supporting his conviction. We affirm.

On the afternoon of April 15, 1975, Oevering completed repair work on a pickup truck belonging to his friend, Daniel Beranek. To celebrate the occasion, the pair commenced an extensive drinking spree which covered several communities in the area of their home. During the course of the evening, they were joined by Paul Gardner, a friend of Beranek.

Shortly after midnight, Gardner requested his companions to leave the bar in which the three had been drinking for several hours. When Oevering and Beranek refused, Gardner left the bar, climbed into the pickup truck and fell asleep. Thereafter, at approximately 12:30 a. m., Oevering and Beranek were joined by Susan Ziemer. She testified that Oevering was "very much drunk." At about 1:15 a. m., Oevering, Beranek, and Ziemer left the tavern. As they proceeded to the pickup truck, Oevering had to be helped. Beranek got in on the passenger side of the truck, and Oevering followed Ziemer in on the driver's side, pushing the sleeping Gardner toward the passenger side.

Oevering drove the three and one-half blocks to Ziemer's residence in Stockton, Minnesota, in an extremely reckless manner. Ziemer alighted from the truck when her home was reached, but remained outside, waiting for the truck to return from the Oevering residence. She assumed that Oevering would be dropped off at his home. Within about 10 or 15 minutes, Ziemer saw the truck returning from the direction of the Oevering residence. The truck appeared to be driven in a more normal fashion and the horn was sounded as the truck passed Ziemer, but she was unable to see who was behind the wheel.

What transpired when the truck stopped at the Oevering residence is unknown, but contrary to Ziemer's assumption, Oevering did not remain at his home. In any event, the pickup truck was driven back through Stockton and on toward Winona, following Highway No. 14. As the truck came over the top of a hill outside Stockton, it was observed by the driver of a semitruck. At that point, the highway was divided into three adjoining lanes. Two lanes were for uphill traffic and only one lane was available for downhill traffic. The steepness of the hill forced the semitruck to climb slowly in the extreme right-hand or "creeper" lane. As the oncoming pickup truck approached, the driver of the semitruck realized that the pickup truck had crossed the yellow line and was in the wrong lane. The semitruck driver was forced to swerve

slightly to the right in order to avoid a collision himself. The pickup truck did collide head on, however, with a jeep which was in the center lane, behind and to the left of the semitruck, killing the driver of the jeep.

The semitruck driver heard the collision and parked his vehicle on the side of the road. He ran back to the point of impact and saw a person crawling out of the passenger side of the pickup truck. This person was later identified as Beranek. Oevering and Gardner, however, were pinned inside the vehicle and had to be extricated by police officers. All three men were taken initially to the Winona Community Hospital for emergency care. Later that evening, Oevering and Beranek were transferred to St. Mary's Hospital in Rochester and Gardner was transferred to a hospital in La-Crosse.

Trooper Richard Duellman of the Minnesota State Highway Patrol arrived to investigate the scene of the accident about 2 a. m. Because the accident had involved a fatality, Duellman at some point contacted the highway patrol dispatcher and requested that an officer visit St. Mary's Hospital in Rochester for the purpose of obtaining any available information from the accident victims (Oevering and Beranek) who had been transferred there. This request was intercepted by Officer Burton Berge of the Olmsted County sheriff's department during his routine patrol. Berge proceeded to St. Mary's Hospital, entered the emergency room, and spoke first to Beranek. Berge identified himself and asked who was driving the truck at the time of the accident. Beranek indicated that he owned the truck, that Oevering had been the driver, and that all of the truck's occupants were extremely intoxicated. He refused to answer any further questions.

Berge then communicated with Duellman, via the highway patrol dispatcher, concerning the information he had received from Beranek. There is some dispute as to whether Duellman at that point offered independent confirmation of the informa-

tion Berge had received. Following the telephone conversation, Berge approached Oevering and again identified himself. The officer observed that Oevering was "quite seriously injured * * * quite combative and belligerent * * *," and that "[i]t didn't seem that he cared or understood what I was trying to say to him * * *." When Oevering did not respond, Berge ordered that a blood sample be taken. It is undisputed that Oevering had not been placed under arrest at the time. Subsequent analysis of the blood sample revealed a blood-alcohol content of .197 percent alcohol by weight.

At the Rasmussen hearing, Oevering unsuccessfully attempted to have the blood test results suppressed. A jury found him guilty of criminal negligence,[1] and he was sentenced to a prison term not to exceed 2 years.

Two issues are raised on appeal:

(1) Was there sufficient evidence introduced at trial to prove that Oevering was in fact the driver of the pickup truck when the accident occurred?

(2) Did the trial court err in refusing to suppress on Fourth Amendment grounds the incriminating blood test results?

■ 1. We find no merit in Oevering's contention that the evidence is insufficient to establish that he was the driver of the pickup truck at the time of the accident. When reviewing a jury verdict, we must examine the evidence in the light most favorable to the verdict and assume that the jury disbelieved any testimony which conflicts with the result it reached. If on the basis of the evidence in the record the jury could reasonably have found as it did, we may not upset that conclusion. *State v. Strimling,* 265 N.W.2d 423 (Minn.1978); *State v. Hawkins,* 260 N.W.2d 150 (Minn. 1977); *State v. Thompson,* 273 Minn. 1, 139 N.W.2d 490, certiorari denied, 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966); *State v.*

*Norgaard,* 272 Minn. 48, 136 N.W.2d 628 (1965).

■ At trial, Gardner testified that he awakened as the pickup truck rounded a corner and started down the hill where the accident occurred. According to Gardner's testimony, he was seated between Oevering and Beranek, and Oevering was driving at the time.[2] Gardner claims to have warned Oevering that the pickup truck was in the wrong lane but apparently received no response.

Also, the police officers who helped to free Oevering and Gardner from the vehicle wreckage testified in detail as to the position of the bodies following the collision. According to their uncontradicted testimony, the force of the impact pushed the truck's firewall back against the seat. This action pinned the feet of Oevering and Gardner between the dash and the seat. Gardner's feet were both trapped on the right, or passenger's side, of the transmission hump. His buttocks were located on the edge of the seat in the middle of the cab. This position is fully consistent with Gardner's testimony that he sat between Oevering and Beranek. Oevering's feet, on the other hand, were caught beneath the dash on the driver's side of the cab. The passenger's side had already been vacated by Beranek when the officers arrived on the scene.

We find the evidence outlined above more than adequately supportive of the conclusion reached by the jury.

2. The second issue in this case is considerably more troublesome. The incriminating blood sample was taken from Oevering without his consent at a time when he was not under arrest. Nevertheless, the analysis of the sample was admitted over defendant's objection and no doubt contributed materially to his conviction. Because the "seizure" of Oevering's blood was effected neither with a warrant nor pursuant to an

---

1. The jury also found him guilty of careless driving and driving while under the influence, but these matters are not before us.

2. Gardner also testified that he had never obtained a driver's license and was unable to operate a vehicle, other than a motorcycle, with a manual transmission.

established justification for a warrantless intrusion, serious Fourth Amendment implications are raised. Our analysis of Oevering's Fourth Amendment rights in this case must begin with the insightful observation of Mr. Justice Bradley in *Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746, 752 (1886):

" \* \* \* It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

The current rule of law concerning the use of blood samples taken from nonconsenting defendants has its source in the case of *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In that case, the driver of an automobile involved in an accident was placed under arrest while receiving treatment at a hospital and was compelled over his explicit objection to submit to a blood test. The United States Supreme Court held the blood test results properly admissible against the automobile driver. In its opinion, the court acknowledged that the seizure of human blood is unquestionably subject to Fourth Amendment constraints. Nevertheless, the court held that the warrantless seizure of blood is allowable when made incident to an arrest and under "emergency" circumstances in which destruction of the evidence (i. e., the blood-alcohol content) is threatened.

Our court has applied the rule of the *Schmerber* decision in *State v. Hansen,* 296 Minn. 42, 206 N.W.2d 352 (1973), and *State v. Capelle,* 285 Minn. 205, 172 N.W.2d 556 (1969). In each of those decisions, however, it was assumed that an arrest was a constitutional prerequisite to a nonconsensual blood sampling.[3] In the case before us, the state concedes that Oevering was not under arrest when the sample of his blood was drawn, but argues that placing a functionally unconscious person under arrest would be a useless gesture. The proper inquiry, the state suggests, is whether Oevering could have been placed under arrest at the time the blood sample was taken.

The state's position is squarely supported by the decision of the Colorado Supreme Court in *People v. Fidler,* 175 Colo. 90, 485 P.2d 725 (1971). In that case, a police officer called to the scene of a traffic accident smelled alcohol on the breath of the driver and discovered two half-empty wine bottles on the floor of his truck. Pursuant to instructions from the police officer, a blood sample was taken from the driver during the course of his emergency treatment in a hospital. The driver was semiconscious and unable to consent to the blood testing. The Colorado court upheld the admission of the blood test under the rationale of *Schmerber v. California, supra,* reasoning that probable cause to arrest a driver of a vehicle was the constitutional equivalent of an actual arrest for the purpose of intoxication testing.

The Colorado court's analysis proved to be prophetic. In 1973, the United States Supreme Court decided *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), a case which in our view controls the instant appeal. There, the husband of a strangulation victim appeared voluntarily at a police station for questioning. During the interview, police officers noticed a dark spot on one of the husband's fingers. The police thereupon asked permission to take

---

**3.** By contrast, the Florida Supreme Court has interpreted *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), to allow blood-alcohol testing where there is a clear indication that such testing would be rele- vant and successful—a reading which we find questionable. See, *State v. Mitchell,* 245 So.2d 618 (Fla.1971), and *Filmon v. State,* 336 So.2d 586 (Fla.1976).

samples from the husband's fingernails. When he refused, the police proceeded to take the scrapings without a warrant and in spite of the husband's protestations. The husband was not under arrest at the time.

The Supreme Court upheld the validity of the search. The court noted that although no formal arrest had been made, there was at the time of the search probable cause to believe the husband guilty of murdering his wife. The court reasoned that since probable cause existed, it was proper to analogize the fingernail scrapings to a search incident to a lawful arrest under the doctrine of *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The opinion recognizes, however, that *Chimel* limits the scope of a search incident to an arrest to an extent which is "commensurate with the rationale that excepts the search from the warrant requirement." 412 U.S. 295, 93 S.Ct. 2003, 36 L.Ed.2d 906. In the court's view, the rationale which excepted the fingernail scrapings from the warrant requirement was the ease with which the suspect could destroy that physical evidence unless it was immediately seized. Accordingly, the court limited the allowable scope of a pre-arrest, probable cause search to only that which is "necessary to preserve the highly evanescent evidence * * *." 412 U.S. 296, 93 S.Ct. 2004, 36 L.Ed.2d 906. The opinion concluded with these words (412 U.S. 296, 93 S.Ct. 2004, 36 L.Ed.2d 906):

> "On the facts of this case, considering the existence of probable cause, the very limited intrusion undertaken incident to the station house detention, and the ready destructibility of the evidence, we cannot say that this search violated the Fourth and Fourteenth Amendments."

■ Under the theory of *Cupp v. Murphy, supra,* then, a warrantless body search may be conducted in spite of the fact that the person searched is not formally under arrest when (1) the character of the search is highly unintrusive, (2) the evidence sought will be forever lost absent the search, and (3) sufficient probable cause

exists to support a formal arrest.[4] We are keenly aware that the standards enunciated in *Cupp v. Murphy, supra,* must be stringently enforced by the courts of this state in order to avoid serious Fourth Amendment abuses in the form of warrantless pre-arrest investigatory searches. Nevertheless, the *Cupp v. Murphy* doctrine can serve an important function in criminal negligence prosecutions. Alcohol-related accidents often produce unconscious or uncommunicative victims. We think it would be absurd to demand the performance of an arrest ritual in the presence of such persons as a prerequisite to the admission of probative blood-alcohol evidence against them. Rather, it seems eminently more sensible to allow the admission of such evidence where probable cause would plainly have supported the arrest of such persons had they been fully conscious. We therefore adopt the rule of *Cupp v. Murphy, supra,* for criminal negligence prosecutions in Minnesota.

■ On the facts of this case, we are convinced that the *Cupp v. Murphy* requirements have been fulfilled. First, the Supreme Court in *Schmerber* clearly recognized the routine and unobtrusive character of blood testing (384 U.S. 771, 86 S.Ct. 1836, 16 L.Ed.2d 920):

> " * * * Extraction of blood samples for testing is a highly effective means of determining the degree to which a person is under the influence of alcohol. See *Breithaupt v. Abram,* 352 U.S. 432, 436, note 3, 77 S.Ct. 408, 411, 1 L.Ed.2d 448, 451 (1957). Such tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain."

In a footnote, the court, quoting *Breithaupt,* stated (384 U.S. 771, note 13, 86 S.Ct. 1836, 16 L.Ed.2d 920):

> " 'The blood test procedure has become routine in our everyday life. It is a ritual

---

4. We emphasize that a formal arrest should be effected whenever the suspect appears capable of understanding and communicating with the arresting officer.

for those going into the military service as well as those applying for marriage licenses. Many colleges require such tests before permitting entrance and literally millions of us have voluntarily gone through the same, though a longer, routine in becoming blood donors.' *Breithaupt v. Abram,* 352 U.S., at 436, 77 S.Ct. 408."

Second, it is beyond question that with the passage of time, normal physiological functions eliminate the alcohol content of an inebriate's blood.[5] At the time Oevering's blood sample was taken, over 4 hours had expired since the collision. Had immediate action not been taken, the blood-alcohol evidence would have been lost.

Finally, we have little difficulty concluding that Officer Berge had probable cause to arrest Oevering on criminal negligence grounds when the blood sample was drawn. When Berge arrived at the hospital, he knew a traffic accident involving a fatality had occurred. Berge also testified that Oevering smelled of alcohol and that Beranek had identified Oevering as the driver of the truck.

In short, the exigencies which justify the limited *Cupp v. Murphy* warrantless search are fully established on the record before us. The judgment of the trial court is therefore affirmed.

Affirmed.

WAHL, Justice (dissenting).

I respectfully dissent. The majority broadly extends the rationale of *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), to excuse one of the "stringently limited conditions" imposed by *Schmerber v. California,* 384 U.S. 757, 772,

86 S.Ct. 1826, 1836, 16 L.Ed.2d 908, 920 (1966), that an arrest precede the unconsented taking of blood from a suspect.[1] *Schmerber* considered several constitutional challenges to compelled blood-alcohol testing, the most serious being the claim that such a search and seizure violated the Fourth Amendment's protection of "personal privacy and dignity." 384 U.S. 767, 86 S.Ct. 1834, 16 L.Ed.2d 917. In upholding the procedure employed, the United States Supreme Court repeatedly referred to the suspect's prior arrest, finding the warrantless detention and testing validly incident thereto, and justified by the rapid dissipation of the alcohol in the blood. The opinion concluded:

"  *  *  * That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." 384 U.S. 772, 86 S.Ct. 1836, 16 L.Ed.2d 920.

In contrast, *Cupp v. Murphy, supra,* involved fingernail scrapings taken from a suspect who had voluntarily gone to a police station for questioning. Mr. Justice Stewart, writing for the majority, noted the "very limited intrusion" undertaken incident to the station house detention and emphasized the limited breadth of the decision: "[W]e do not hold that a full *Chimel* [*v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (recognizing an exception to the warrant requirement when a search is incident to a valid arrest)] search would have been justified in this case without a formal arrest and without a warrant." 412 U.S. 296, 93 S.Ct. 2004, 36 L.Ed.2d 906.

5. See, *Schmerber v. California,* 384 U.S. 757, 770, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908, 920.

1. Not only does the majority stop short of expressly retaining the arrest requirement for more lucid suspects, footnote 4, *supra,* but it introduces a distinction which is practically difficult and theoretically unprincipled. The defendant here *was* conscious, his belligerence and disorientation not atypical of an intoxicated accident victim. Under such circumstances, a determination of whether a suspect "appears capable of understanding and communicating with the arresting officer" is a difficult question of degree at the time, one which may be impossible to fairly examine in later judicial proceedings. Moreover, by basing the decision on *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), where the suspect was clearly aware and apprehensive of the situation, the conscious/unconscious distinction is obviously vulnerable to later erosion.

That the arrest requirement of *Schmerber*-type intrusions was unchanged is clear from this reference in *United States v. Dionisio*, 410 U.S. 1, 8, 93 S.Ct. 764, 769, 35 L.Ed.2d 67, 76 (1973), decided in the same term with *Cupp v. Murphy, supra,* and also written by Mr. Justice Stewart:

"As the Court made clear in *Schmerber, supra,* the obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two different levels—the 'seizure' of the 'person' necessary to bring him into contact with government agents, see *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), and the subsequent search for and seizure of the evidence. *In Schmerber, we found the initial seizure of the accused justified as a lawful arrest, and the subsequent seizure of the blood sample from his body reasonable in light of the exigent circumstances.*" (Italics supplied in part.)

The requirement that an arrest precede the unconsented extraction of blood has been almost uniformly applied by a majority of the states,[2] and consistently assumed by our own. *State v. Hansen,* 296 Minn. 42, 206 N.W.2d 352 (1973); *State v. Capelle,* 285 Minn. 205, 172 N.W.2d 556 (1969). Arrest is no mere formality, but designed to provide an accused with "full warning of official suspicion", *Cupp v. Murphy,* 412 U.S. 291, 296, 93 S.Ct. 2000, 2004, 36 L.Ed.2d 900, 906, as well as requiring a determination of probable cause *prior* to obtaining additional evidence from the search.[3] Failure to require an arrest, even of the "functionally unconscious", is an invitation to abuse and the retrospective application of newly found probable cause.

Finally, I am not convinced that the Fourteenth Amendment's protection against procedures which offend our "sense of justice", *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), while apparently insufficient to prohibit the unconsented taking of a suspect's blood, *Breithaupt v. Abram,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957), is not strongly interrelated with the "stringently limited conditions" incident to the "reasonable" search upheld by *Schmerber v. California, supra.* See, Note, 1971 Duke L.J. 601.

2. See, generally, *Holland v. Parker,* 354 F.Supp. 196 (D.S.D.1973); *Layland v. State,* 535 P.2d 1043 (Alaska 1975); *People v. Superior Court of Kern County,* 6 Cal.3d 757, 100 Cal.Rptr. 281, 493 P.2d 1145 (1972); *State v. Towry,* 26 Conn.Sup. 35, 210 A.2d 455 (1965); *State v. Howard,* 193 Neb. 45, 225 N.W.2d 391 (1975); *State v. Davis,* 108 N.H. 45, 226 A.2d 873 (1967); *State v. Richerson,* 87 N.M. 437, 535 P.2d 644 (N.Mex.Ct.App.1975), certiorari denied, 87 N.M. 450, 535 P.2d 657 (1975); *People v. Butor,* 75 Misc.2d 558, 348 N.Y.S.2d 89 (Cty. Ct.1973); *People v. Young,* 42 Misc.2d 540, 248 N.Y.S.2d 287 (Cty.Ct.1964); *State v. Cruz,* 21 Utah 2d 406, 446 P.2d 307 (1968); *State v. Wetherell,* 82 Wash.2d 865, 514 P.2d 1069 (1973); *State v. Kroening,* 274 Wis. 266, 79 N.W.2d 810 (1956); *State v. Doe,* 78 Wis.2d 161, 254 N.W.2d 210 (1977). Compare *State v. Brunner,* 211 Kan. 596, 507 P.2d 233 (1973), with *State v. Gordon,* 219 Kan. 643, 549 P.2d 886 (1976).

See, also, *State v. Ball,* 123 Vt. 26, 179 A.2d 466 (1962), and *State v. Byers,* 224 S.E.2d 726 (W.Va.Ct.App.1976), suppressing solely on statutory grounds.

See, also, *Commonwealth v. Quarles,* 229 Pa. Super. 363, 324 A.2d 452 (1974), requiring arrest before transporting a suspect.

Contra, *People v. Fidler,* 175 Colo. 90, 485 P.2d 725 (1971); *DeVaney v. State,* 259 Ind.

483, 288 N.E.2d 732 (1972); *State v. Findlay,* 259 Iowa 733, 145 N.W.2d 650 (1966).

3. There are also several policies against a rule that probable cause to arrest is a ground for a warrantless search. Many courts forthrightly object to developments in the law which would tend to allow random police searches; the requirements of a warrant or contemporaneous arrest are viewed as essential protection against dragnet searches. Moreover, such a rule would kindle judicial fears that the reason an arrest was not made contemporaneously with the search was because the probable cause was so dubious that the police wished to bolster their case against the suspect before arresting him. The requirement of either a warrant or an arrest forces the police to make a commitment and discourages "fishing expeditions"; at the same time, it makes available a record of police conduct for use in determining whether there has been an illegal search or seizure. A further, unexpressed fear underlying appellate court attitudes in this area may be that the fruits of a search which proved guilt would be difficult for the trial court to disregard when determining the question of original probable cause to make the arrest. Note, 18 Stanford L.Rev. 243, 252.

I believe that requiring the police to make a lawful arrest prior to taking the suspect into custody for a blood test should be the minimal constitutional standard. Accordingly, I dissent from the opinion of the court.