No. 88,030

STATE OF KANSAS, *Appellee*, v. BALA KROVVIDI,
*Appellant.*
(58 P.3d 687)

Opinion filed
December 6, 2002.

*Stephen G. Mirakian,* of Wyrsch Hobbs & Mirakian, P.C., of Kansas City, Missouri, argued the cause, and *Marilyn B. Keller,* of the same firm, was with him on the briefs for appellant.

*Steven J. Obermeier,* assistant district attorney, argued the cause, and *Paul J. Morrison,* district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Bala Subrahmanyan Krovvidi's appeals his sentence and conviction for vehicular homicide. Following a bench trial, the trial court found that Krovvidi had run a red light causing the accident which resulted in the death of Daniel Hawthorne. The trial court concluded that the running of the red light, with no indication of other recklessness or impairment, satisfied the necessary element of a "material deviation" from the standard of care required for a conviction of vehicular homicide under K.S.A. 21-

3405. For the reasons set forth in this opinion, we reverse and remand with instructions to vacate the sentence.

On March 11, 2000, Daniel Hawthorne left his brother's house in Overland Park, driving a blue 1982 Pontiac station wagon. At 3:49 p.m., Officer Steve Lopez of the Overland Park Police Department responded to an accident scene at 103rd and Lowell streets. As southbound vehicles on Lowell approach the T-intersection at 103rd Street, they must either turn east or west, but cannot continue south. Officer Lopez testified that a Jeep Grand Cherokee driven by defendant Krovvidi traveling west on 103rd had collided with Hawthorne's southbound station wagon that was attempting to turn left.

The impact of the collision caused extensive damage to the left side of Hawthorne's station wagon and moved the body of the vehicle completely off its frame. Hawthorne had sustained severe head injuries and was exhibiting shallow breathing. The left side of his vehicle was crushed, the doors were locked, and officers could not gain entry. Lopez used his flashlight to break out the right rear window in order to gain access to the vehicle so other officers could render aid to Hawthorne.

While at the scene, Lopez received notification that Hawthorne died as a result of the collision. Lopez then asked Krovvidi to provide blood and urine samples; Krovvidi complied. The Kansas Bureau of Investigation lab tests showed there was no alcohol in Krovvidi's blood or any illegal drugs in his urine.

The State filed a complaint charging Krovvidi with one count of class A misdemeanor vehicular homicide, one count of failure to obey an official traffic control signal, and one count of failure to yield the right of way.

Two eyewitnesses provided statements to the police and testified at trial. Chris Bartlett, who lived in Overland Park near Lowell Street testified that on the day of the accident he was driving south on Lowell toward 103rd at approximately 20 to 22 m.p.h. behind a blue station wagon. As he drove down the slope of a hill toward the intersection, Bartlett observed the traffic light go from green to yellow. The blue station wagon operated by Hawthorne was approximately 1 second ahead of Bartlett's vehicle. As Hawthorne's

vehicle approached the white line at the intersection, the light was yellow and had been yellow for some time. Bartlett testified that Hawthorne did not speed up or slow down; however, his statement to the police indicated that the driver of the blue station wagon "decided to charge the light," meaning that he tried to beat the yellow light.

When Bartlett got to the intersection, the light had changed to red, and he stopped. He stated that Hawthorne's vehicle was "a fourth of the way through the intersection" still traveling at a slow rate of speed when the light turned red. According to Bartlett, 2 or 3 seconds after the light turned red, Krovvidi's vehicle struck the driver's side of Hawthorne's vehicle. Bartlett did not see Krovvidi's vehicle coming but he was certain that Krovvidi did not stop before entering the intersection. Bartlett stated that he had his music very loud and did not hear any skidding or braking that might have occurred.

Lilla Khalifah, a long-time Overland Park resident, testified that on March 11 she drove her vehicle west on 103rd Street and stopped at the traffic light at Lowell. She stated that traffic was not heavy and that her vehicle was in the right lane of two westbound lanes on 103rd. Khalifah testified that she thought the Jeep might have already been stopped at the intersection of Lowell and 103rd when she pulled up at the stoplight. She stated that in her peripheral vision she noticed a vehicle pull ahead in the other westbound lane of 103rd Street. According to Khalifah, she heard the crash and then looked at the traffic light, which turned from red to green while she looked at it. She did not hear skidding or sudden braking.

Officer Lopez testified that based on his training and experience and the damage to the Hawthorne vehicle, he did not think Krovvidi's vehicle actually stopped prior to entering the intersection. Lopez testified that Krovvidi stated at the scene that his light was green.

Robert "Buck" Taylor, a Traffic Signal Specialist II with the Overland Park Public Works Department, testified about the traffic light time sequences at the intersection of Lowell and 103rd Street. According to Taylor, the traffic light for the southbound street traffic stays green for a minimum of 16 seconds, turns yellow

for 3.4 seconds, and then changes to red. Taylor testified that the "all-red clearance" for the traffic light was 2 seconds, meaning that all traffic lights at the intersection remain red for 2 seconds before the light on 103rd turns green.

Dale Bain, an Overland Park senior engineering technician, testified for the State that the distance across the two westbound lanes from the stop line was 31 or 32 feet. Bain stated that by using a generally accepted formula and assuming a speed of 20 m.p.h., the Hawthorne vehicle would have traveled 29.4 feet into the intersection in 1 second. In 2 seconds, his vehicle could have traveled 58.8 feet, clearing the westbound lanes of 103rd Street.

At the close of the State's evidence, counsel for Krovvidi moved the court for a judgment of acquittal on the vehicular homicide count and the failure to yield count. Counsel stated that one basis for Krovvidi's motion was that the State had failed to put on evidence of careless or reckless driving, and without such evidence the State could not establish the element of a material deviation from the standard of care necessary to support vehicular homicide.

In considering Krovvidi's motion for judgment of acquittal, the district court reviewed the vehicular homicide statute:

"THE COURT: Where they created kind of an extra tier, haven't they, in this statute? I mean, traditionally, always in civil, you've had the tiers of simple negligence and then willful and wanton disregard for the safety of others. But here it looks like the legislature has created, if they meant 'simple negligence,' they could have said 'simple negligence.' It looks like they've created kind of an additional tier that's somewhere in between, as counsel has indicated."

After hearing the arguments of counsel, the district court took the matter under advisement because the court believed the matter involved a legal issue, in part. After the court's ruling, the defense presented its witnesses.

James Loumiet, an accident reconstructionist, testified concerning the speed of the two vehicles involved in the collision. Loumiet testified that the minimum speed of Krovvidi's vehicle at the time of impact was 27 m.p.h. and the maximum speed was 32 m.p.h. Loumiet stated that Hawthorne's vehicle had traveled at a minimum speed of 16 m.p.h. and a maximum of 25 m.p.h. Loumiet also stated that it was his belief as an accident reconstructionist

that the impact occurred in the southernmost westbound lane of 103rd Street, 26 feet from the point where vehicles would stop for a red light.

Mukesh Chaudhari, a front-seat passenger in Krovvidi's vehicle, told the court that he was looking out the side window at the time of the collision. Chaudhari did not see the traffic signal before the collision but testified that there were no distractions in Krovvidi's vehicle.

Gouri Sridevi, a coworker of Krovvidi's testified that she was sitting in the back of Krovvidi's vehicle on the passenger side prior to the accident. Sridevi stated that she was trying to open an instant camera and was not engaged in any conversation with Krovvidi. Sridevi could not remember whether Krovvidi stopped at the intersection. She did not see the traffic signal before the collision. According to Sridevi, Krovvidi was not talking on a cell phone, was not weaving in and out of traffic lanes, and did not appear upset with any other drivers on the road. There was nothing about his driving that made her uncomfortable.

Krovvidi testified that on the afternoon of the collision, he drove his vehicle west on 103rd Street to go to Oak Park Mall accompanied by three friends, Chaudhari, Sridevi, and Parul Isharani. Krovvidi testified that before the collision, he had just turned left onto 103rd Street from the parking lot of his apartment building, 168 yards from the accident intersection. The speed limit on 103rd was 35 m.p.h. Krovvidi stated that he drove at a speed of 30 to 35 m.p.h. but did not exceed 35 m.p.h. Krovvidi denied consuming any alcohol, but testified that he took some Ny-Quil the night before and in the morning because he had a bad cold. Early that morning, Krovvidi stated that he took a nondrowsy Tylenol product. However, Krovvidi denied having any drowsiness or impairment in his driving ability that afternoon.

Krovvidi further testified that he did not change lanes once he pulled onto 103rd Street, he did not use his cell phone, and he was not angry or upset at any other drivers. As he approached the intersection of 103rd and Lowell streets, there were no cars directly in front of him. In response to his counsel's questions, Krovvidi testified on direct examination:

"Q. Now, what color was the light as you—to your recollection what color was the light as you entered into the intersection?

"A. The best of my recollection, I've heard so many people testify, but to the best of my representation, it was green. And that is where I rolled past.

"Q. Now, as you approached that intersection, do you recall whether or not you substantially slowed your vehicle for any reason?

"A. No.

"Q. As you are approaching an intersection when you believe you have a green light, is it your standard practice for you to be substantially slowing your speed?

"A. I don't usually slow down. I don't think anybody does.

"Q. Did you observe anything that day at the intersection—other traffic or cars, people—that caused you to believe, as you proceeded into the intersection, that there was a need for you to slow your vehicle or stop your vehicle?

"A. I did not get any indication from the traffic because there was nobody around.

"Q. Now, as you entered the intersection of 103rd and Lowell, and before you got all the way through that intersection, there was a collision; was there not?

"A. That is correct.

"Q. Can you describe to the judge basically what you observed as you approached the intersection, and in those few moments between the time you approached the intersection and up to the collision, tell the judge what you saw?

"A. I just turned left onto the 103rd Street and was heading west. Essentially I was rolling past at the speed of 30 to 35 miles an hour, that was the road speed at the time. And from—I was just looking ahead and from the middle of me where I saw a blue vehicle come in front of me and I could not brake. Essentially, the moment I observed the vehicle I tried to brake and turn left, to the best of my recollection, trying to avoid the collision, but I could not.

"Q. Had you seen the vehicle that you collided with, had you seen that vehicle at all along Lowell or any point in the intersection before—just the moment before the impact?

"A. Me? No, I did not. I would have stopped."

At the close of evidence, counsel for Krovvidi filed a written motion for judgment of acquittal and a brief in support. In addition, counsel for Krovvidi submitted proposed findings of fact and conclusions of law. The court delayed consideration of the legal issues raised by Krovvidi but announced its findings of fact:

"The Court finds with respect to the accident that occurred the following facts, that at the time that the motor vehicle driven by Daniel Lee Hawthorne entered the intersection of Lowell Avenue and 103rd Street that the light controlling traffic from his direction was yellow, had been yellow for some time prior to that, such that it was possible for him to have brought his vehicle to a stop, that he proceeded into the intersection under a yellow light. The Court further finds that at the time the vehicle driven by the defendant Mr. Krovvidi entered the intersection at 103rd

and Lowell Avenue from the east headed in a westbound direction that the traffic light controlling his direction of travel was red and that he entered the intersection at a time when he was prohibited—his entry was prohibited by the red light. The court further finds at the time of the impact of the two vehicles, which occurred in roughly I think the center of the intersection but I think the southernmost westbound lane at 103rd Street, that the traffic light controlling the entry of vehicles into the intersection on 103rd Street in a westbound direction was red. The Court further finds that had the vehicle driven by Mr. Krovvidi not entered the intersection at the time that the vehicle did enter the intersection under a red light, that at the speed the vehicle driven by Mr. Hawthorne was proceeding, that vehicle would have cleared the . . . southernmost westbound lane of 103rd Street such that the accident would not have occurred."

The trial court then concluded that the act of inattentive driving merged with the conduct of running the red light, that the act of running a red light inherently involved a failure to yield the right-of-way and, therefore, that the failure to yield merged into the overall offense of running the red light. The trial court concluded:

"Now, that leaves us, Counsel, with, as I've indicated, the question of whether or not this traffic infraction, which I find was not compounded in any way, shape or form by other activities or events that were going on, there's no indication there was any consumption of alcohol that impaired Mr. Krovvidi's driving, there was no indication there was any consumption of any drugs that would have impaired his driving, no activities in the car that would have impaired his ability to operate the motor vehicle. It was running a red light that resulted in a terrible, horrible traffic accident that resulted in a tragic loss of life. Does that, as a matter of law, rise to the level of negligence that is required to trigger the operation of the criminal offense under K.S.A. 21-3405? That threshold or burden of proof is greater than simple negligence but less than willful or wanton disregard and reckless conduct. I leave it to counsel to respond to that for the next hearing . . . ."

A posttrial hearing was held on July 27, 2001, with the trial court ultimately deciding that the State had sustained its burden of proof to demonstrate, beyond a reasonable doubt, that each of the elements of the crime of vehicular homicide had been met and found Krovvidi guilty of one count of misdemeanor vehicular homicide. On October 18, 2001, the trial court sentenced Krovvidi to 300 days' confinement in the county jail and 12 months' probation. He filed a timely appeal of his conviction and sentence.

Our jurisdiction is based upon our transfer pursuant to K.S.A. 20-3018(c).

### Discussion and Analysis

Krovvidi assigns four errors. All assigned errors center upon one of the essential elements of vehicular homicide—that a defendant's operation of his automobile "constitutes a material deviation from the standard of care which a reasonable person would observe under the same circumstances." K.S.A. 21-3405. In his first assigned error, Krovvidi contends that the evidence is not sufficient to support this element. Krovvidi also claims that the trial court abused its discretion in broadly interpreting K.S.A. 21-3405 to incorporate the running of a red light without more as a violation of K.S.A. 21-3405. Krovvidi claims that K.S.A. 21-3405, as applied to the facts of this case, is rendered unconstitutionally vague and indefinite, violating his due process rights under the state and federal constitutions. Finally, Krovvidi contends the trial court ignored the contributory negligence of Hawthorne, rendering the final verdict unsupported by all evidence admitted at trial.

The questions raised by Krovvidi present questions of law. Interpretation of a statute is a question of law, and the appellate court's review is unlimited. We are not bound by the district court's interpretation. *State v Engles*, 270 Kan. 530, 532-33, 17 P.3d 355 (2001). The first question has to do with the interpretation of K.S.A. 21-3405 and the meaning of the phrase "material deviation" as used in the statute. The second requires this court to determine whether, under the totality of circumstances, Krovvidi's operation of his vehicle constituted "a material deviation from the standard of care which a reasonable person would observe under the same circumstances."

### K.S.A. 21-3405

K.S.A. 1993 Supp. 21-3405 provides in pertinent part:

"Vehicular homicide is the unintentional killing of a human being committed by the operation of an automobile, airplane, motor boat or other motor vehicle in a manner which creates an unreasonable risk of injury to the person or property of another and which constitutes a material deviation from the standard of care which a reasonable person would observe under the same circumstances."

Kansas formerly had a negligent homicide statute which criminalized "the driving of any vehicle in negligent disregard of the

safety of others" resulting in the death of any person. G.S. 1949, 8-529. "Cases under that statute interpreted it to apply to *ordinary* negligence on the part of the driver of the vehicle which proximately resulted in the death of another. [Citations omitted.]" *State v. Makin*, 223 Kan. 743, 744, 576 P.2d 666 (1978). The legislature repealed the negligent homicide statute in 1969, however, and replaced it with K.S.A. 21-3405, the vehicular homicide statute. Vehicular homicide requires something more than simple or ordinary negligence. K.S.A. 21-3405 calls for proof of a "material deviation" in the operation of a vehicle as an element for conviction.

In *State v. Gordon*, 219 Kan. 643, 653-54, 549 P.2d 886 (1976), the State claimed it only had to prove simple negligence to convict a defendant of vehicular homicide. Noting the legislative history of the Kansas vehicular homicide statute, the *Gordon* court disagreed:

"We think the Legislature meant something more than simple negligence when it defined the standard of conduct condemned under the vehicular homicide statute.

"The vehicular homicide statute (K.S.A. 21-3405) was enacted in 1969 with the wording 'substantial deviation.' Whether its drafters intended this wording to mean something more than simple negligence need not be decided, because legislative action in 1972 provides a clearer indication of legislative intent. In 1972, legislation was introduced which would have amended the statute by changing 'creates an unreasonable risk of injury' to 'creates a risk of injury,' and by changing 'a substantial deviation' to 'a deviation.' As enacted, the legislation made only one change in the statute; 'substantial' was changed to 'material.' (L. 1972, Ch. 113, § 1.)

"We view the change made to the statute in 1972 to be, in essence, no change at all. 'Substantial' and 'material' have been construed as synonymous terms. *Lewandoski v. Finkel*, 129 Conn. 526, 29 A.2d 762. The Legislature was presented with language that would have clearly indicated only simple negligence was intended. The Legislature chose not to adopt such language. We conclude that the degree of negligence contemplated by the Legislature in K.S.A. 21-3405 is something more than simple negligence." 219 Kan. at 654.

In *State v. Randol*, 226 Kan. 347, 349-50, 597 P.2d 672 (1979), this court reviewed *Gordon* and the predecessor statute, K.S.A. 8-529:

"A conviction under the present statute requires a finding that the defendant was guilty of conduct '*which creates an unreasonable risk of injury to the person or property of another and which constitutes a material deviation from the stan-*

*dard of care which a reasonable person would observe under the same circum-*
*stances.'*

. . . .

". . .While the statute in its present form no longer refers to negligence as the basis for the offense, the overwhelming majority of vehicular homicide statutes from other jurisdictions contain some express reference to 'negligent conduct.' Some require only 'simple' negligence while others require 'criminal' and 'gross' negligence. [Citation omitted.] Cases under our old negligent homicide statute interpreted it to apply to *ordinary* negligence on the part of the driver of the vehicle which proximately resulted in the death of another. [Citations omitted.]

"Even though 'negligence' is not expressly mentioned in 21-3405, we have held that it is still the gravamen of the offense. *State v. Choens*, 224 Kan. 402, 580 P.2d 1298 (1978); *State v. Makin*, 223 Kan. 743, 576 P.2d 666 (1978). In *Makin* the defendant was convicted of voluntary manslaughter and appealed to this court asserting that the vehicular homicide statute, being a specific statute, superseded the general manslaughter statute. We held that it did except in cases of wanton conduct which was equated with gross negligence. This determination was amplified upon in *Choens*. It is now established that the 'material deviation' required for a conviction under 21-3405 requires something more than ordinary or simple negligence yet something less than gross and wanton negligence." *Randol*, 226 Kan. at 350-51.

The *Randol* opinion continued with a discussion of the difficulty of distinguishing degrees of the deviation from the standard of care demonstrated in the defendant's conduct. The degree of deviation from the standard of care is the key to determining whether the defendant bears no criminal responsibility or may be convicted of vehicular homicide or involuntary manslaughter.

"In *Makin*, we recognized the difficulty in distinguishing 'wanton conduct' (gross negligence) from 'simple negligence.'

'In determining whether particular conduct is wanton, each case must stand on its own footing as applied to the facts involved. [Citation omitted.] Precise statements of what constitutes wanton or gross negligence are impossible. If the absence of negligence is white and gross negligence is black, then innumerable shadings of grey lie between. Using this analogy the legislature *obviously seeks to exclude the pale grey areas from criminal responsibility.* . . .

'The totality of the circumstances must be considered. Identical conduct under different circumstances may result in no criminal responsibility, vehicular homicide, or involuntary manslaughter. For example, let us assume that a person is operating his vehicle at 60 miles per hour on dry pavements on a sunny day with little traffic at 4:00 on a Tuesday afternoon and he strikes and kills a pedestrian crossing the road. This same set of facts could be (a) no responsibility if it occurred in a remote, sparsely populated area; (b) vehicular homicide if it occurred in a

residential area; and (c) involuntary manslaughter in a posted school zone. Even within these classes additional facts would have to be supplied before a definitive statement could be made.' " (Emphasis added.) *Randol*, 226 Kan. at 353.

In *State v. Hickey*, 12 Kan. App. 2d 781, 783, 757 P.2d 735, *rev. denied* 243 Kan. 781 (1988), the Court of Appeals distinguished vehicular homicide from aggravated vehicular homicide on the basis of the manner of driving that resulted in the unintentional homicide. The *Hickey* case concerned the issues of the propriety of the jury instructions and admissibility of blood alcohol testing. We note, however, that *Hickey* and *Randol* instruct that the manner in which a defendant operates his or her vehicle under the totality of the circumstances presented is the proper focus of an inquiry concerning the element of a "material deviation" required for conviction under K.S.A. 21-3405. While considering the defendant's operation of his or her vehicle under the totality of the circumstances, a court must decide if the defendant's conduct materially deviated from ordinary due care.

"As we have indicated previously, a material deviation is such a departure from the ordinary standards of due care to amount to more than simple or ordinary negligence yet less than gross and wanton negligence. [Citations omitted.]" *Randol*, 226 Kan. at 353.

*Randol* provides perhaps the best definition of the phrase "material deviation." It is determined on a case-by-case basis. The conduct proscribed by the legislature is not capable of exact definition, nor may the phrase "material deviation" be defined by a bright line rule applicable to all circumstances. Consistent with the intent of the legislature, the meaning of the phrase "material deviation" depends upon the facts of each given case. A "material deviation" as used in K.S.A. 21-3405 is conduct amounting to more than simple or ordinary negligence and yet it is conduct not amounting to gross and wanton negligence. *Randol*, 226 Kan. at 353. The conduct of a defendant charged under K.S.A. 21-3405 is to be judged under the totality of the circumstances.

*Whether Under the Totality of Circumstances Defendant's Operation of His Vehicle Constituted "a material deviation from the standard of care which a reasonable person would observe under the same circumstances."*

Krovvidi asserts that the "mere violation of a traffic statute or ordinance through inattention, unless compounded by other operational misconduct, alcohol or drug impairment or other aggravating conditions or circumstances, will not support a conviction of vehicular homicide." Relying on the precedent of *State v. Trcka*, 20 Kan. App. 2d 84, 884 P.2d 434 (1994), *Randol*, and *Gordon*, Krovvidi contends that the facts found by the court establish only his failure to comply with a traffic signal due to inattention, conduct he labels as ordinary neglect. Krovvidi argues that the district court did not find any aggravating or compounding factors or circumstances showing that his operation of the vehicle materially deviated from the standard of care, a necessary element. Krovvidi claims that the facts found by the district court do not support its legal conclusion of guilt. Further, Krovvidi asserts that the district court found "that the proof of unreasonable risk and material deviation were one and the same, . . . [thereby relieving] the State of its obligation to prove a necessary element of the offense."

The State contends that viewing the evidence in the light most favorable to the prosecution, a rational factfinder could find beyond a reasonable doubt that Krovvidi's conduct constituted a material deviation from the standard of care a reasonable person would observe. According to the State, Krovvidi drove into an intersection under normal road conditions where the light had been red for some time when another car in plain view was in the intersection. The State points to the absence of braking, skidding, or swerving on Krovvidi's part as additional evidence of material deviation. The State cites several cases in support of its position, including *State v. Burrell*, 237 Kan. 303, 699 P.2d 499 (1985); *Trcka*, 20 Kan. App. 2d at 86; *State v. Boydston*, 4 Kan. App. 2d 540, 609 P.2d 224 (1980); *State v. Pelawa*, 590 N.W.2d 142 (Minn. App. 1999); and *State v. Gillon*, 15 S.W.3d 492 (Tenn. Crim. App. 1997).

Citing Krovvidi's inattentive driving as a factor in the collision, the trial court found that Krovvidi's inattentiveness and conduct in

running the red light constituted a material deviation from the standard of care. The trial court did not find, however, that the absence of evidence of braking, skidding, or swerving by Krovvidi evidence a material deviation from the standard of care.

In *Burrell*, the defendant ran a stop sign and struck a car at an intersection. A female passenger in the car was 8 months pregnant and died as a result of the collision, and the defendant was charged with two counts of involuntary manslaughter. A passenger in the defendant's pickup truck testified at the preliminary hearing that the stop sign was plainly visible as they approached the intersection, but the defendant began to accelerate as they advanced toward the sign. The passenger warned the defendant about the stop sign, but the defendant either did not hear her or ignored her and continued accelerating. She also testified that the defendant had consumed three or four beers that evening and was drinking beer while he drove. She stated that although the defendant claimed the reason he failed to stop was that the accelerator stuck, she did not remember the defendant ever trying to apply his brakes.

The district court in *Burrell* dismissed the case, finding that the defendant's conduct failed to demonstrate gross or wanton negligence, a required element of involuntary manslaughter. The district court believed that under the facts presented, the case would be more appropriately charged as vehicular homicide under K.S.A. 21-3405. On appeal, this court reversed and stated:

"In the present case, we have studied the record and find ample evidence from which a jury could conclude the defendant's illegal act of speeding through the stop sign was committed wantonly. He was warned by a passenger in his vehicle of the stop sign they were approaching. The defendant knew, or should have known, that Rock Road was heavily traveled. (He lived nearby and we can assume he was a frequent user of the road on trips from Mulvane to Derby.) The defendant could easily have seen the stop sign from the crest of the hill on 103d Street. Because visibility at the intersection was limited, the defendant should have stopped so as to make sure no traffic was coming. Instead, the defendant actually increased his speed through the stop sign and made no attempt to stop." 237 Kan. at 307-08.

Unlike the case we consider, the defendant in *Burrell* ignored his passenger's warning of the stop sign and accelerated as he approached the stop sign, giving rise to the inference that the de-

fendant, knowing of the stop sign, intended to run it. In addition, the defendant driver was drinking beer while he drove.

In *Trcka*, two employees of an asphalt company were in a half-ton pickup truck on the pavement while removing constructions signs. A large orange sign reading "Pilot Car Follow Me" was affixed to the pickup, and an amber flashing light was mounted on top of the sign. A witness testified that both the amber light and the pickup's hazard lights were on at the time of the accident. A semitrailer truck driven by Trcka struck the pickup, sending both vehicles over an embankment where they caught fire. The employee in the pickup, who was not driving, rode on the back of the pickup to retrieve signs and was able to jump clear prior to the collision. He testified that Trcka did not decelerate as he approached the pickup, apply the brakes, or attempt to swerve. Trcka told a Kansas Highway Patrol Trooper he thought his rate of speed was 50-55 m.p.h. Trcka was charged with vehicular homicide. *Trcka*, 20 Kan. App. 2d at 84-86.

The Court of Appeals determined that sufficient evidence supported the district court's finding that the defendant's conduct constituted a material deviation from a reasonable standard of care:

"The evidence supports the conclusion that Trcka was travelling 50 to 55 miles per hour in a 45 miles per hour zone and that he did not see the clearly marked pickup until the impact, although the pickup was in full view from a distance of 1,320 feet, or one quarter of a mile.

"We agree with the State that for a professional driver to be oblivious to his surroundings while propelling a semitrailer truck down a highway at 50 to 55 miles per hour is closer to reckless and wanton conduct than to simple negligence. Viewing all of the evidence in the light most favorable to the prosecution, we hold that a rational factfinder could have found that Trcka's conduct constituted a 'material deviation' from the standard of care which a reasonable person would observe under the same circumstances." 20 Kan. App. 2d at 88.

As in *Burrell*, the facts in *Trcka* are dissimilar and more extreme than those presented here. In both cases, additional facts contributed to the conclusion that the conduct of each defendant constituted a material deviation. The inattentiveness of the semi driver in *Trcka* was prolonged for more than ¼ mile and the orange sign and flashing light failed to alert the semi driver to the presence of

the pickup truck. In addition, the defendant in *Trcka* was clearly speeding as he drove through a construction zone.

In *Boydston*, 4 Kan. App. 2d 540, a car driven by Boydston ran a stop sign and collided with another vehicle, killing the other driver. The Court of Appeals wrote:

"Furthermore, the main cause of the tragic accident in the instant case was the failure of the appellant to stop at a stop sign, and not specifically the amount of speed with which he passed the same. There was evidence from which the jury could have determined that defendant was traveling at a high rate of speed. Such other evidence consisted of the testimony of Officer Van Houten, the first officer to arrive at the scene, who testified that he observed the right side of the vehicle driven by the victim, and the degree of its indentation. He made the further observation that appellant's vehicle had sustained damage to the front-end 'A-frame' which extended beyond the bumper and radiator area. Officer William James testified that the victim's vehicle had a 'U'd' appearance which indicated to him that the vehicle had been struck with a great amount of force. Dr. Bruce Barrick testified that based upon his autopsy, the decedent had died from injuries 'consistent with high speed injury,' and while he also testified on cross-examination that such injuries would be consistent with low-speed injuries, the pictures gave more credence to his 'high speed' statement. In addition, the pictures of the vehicles indicate high speed because of the extensive damage done to the vehicles. As was noted by the court in *Foreman v. Heinz*, 185 Kan. 715, 719, 347 P.2d 451 (1959), in discussing photographs admitted in that case, such photographs were 'silent but conclusive proof of the fact that at the time of impact at least one of the cars was traveling at a high rate of speed.' Another witness, Warren Hicks, observed that appellant ran a stop sign and this lends considerable support to the jury's finding that there was a material deviation by the appellant from the standard of care of a reasonable person." 4 Kan. App. 2d at 542-43.

The State suggests that because the main cause of the accident in *Boydston* was said to be the defendant's failure to stop at a stop sign, and because the Court of Appeals upheld the defendant's conviction for vehicular homicide, this court should consider Krovvidi's conduct in running the stoplight a material deviation from the standard of due care exceeding ordinary negligence.

We reject the State's argument for two reasons. First, the *Boydston* court was not asked on appeal to test the sufficiency of the evidence supporting the defendant's conviction for vehicular homicide. Instead, *Boydston* considered issues of statutory vagueness, propriety of jury instructions, admission of expert testimony, and endorsement of witnesses. Thus, *Boydston* does not truly provide

stare decisis authority on the issue of sufficiency of the evidence as to conduct establishing a material deviation from the standard of care which a reasonable person would observe under the same circumstances. Second, the *Boydston* court repeatedly highlights the speed of the defendant's vehicle. Had the court examined the sufficiency of the evidence, we believe it likely that the defendant's high rate of speed would have constituted a necessary additional factor supporting the conclusion that defendant's conduct was a material deviation.

In a similar manner, the foreign cases cited by the State are factually dissimilar and fail to provide support for its position in this case. In *Gillon*, 15 S.W.3d 492, the defendant was convicted of criminally negligent homicide after driving at a high rate of speed across a four-lane highway. The criminally negligent homicide statute required a finding that the defendant acted intentionally, knowingly, or recklessly. The *Gillon* court found that the defendant exhibited recklessness conduct in that:

"the defendant, a resident of that general area of the county, was aware of the four-lane highway, the stop sign, and the distance from his point of entry through the median to the point of impact. Yet, despite having two clear opportunities, the defendant never slowed his truck as he drove over three lanes of traffic and a median strip. This, in our view, warranted the jury's conclusion that the defendant was aware of and consciously disregarded the risk that a collision would occur." 15 S.W.3d at 497.

In *Pelawa*, 590 N.W.2d 142, the Minnesota Court of Appeals noted that Pelawa was northbound when his car crossed the center line into the southbound lane, went onto the shoulder of the southbound lane, and back into the southbound lane where it collided with another car, killing two people. Blood tests at the hospital revealed that Pelawa had a blood alcohol concentration of .08. The court examined whether the evidence presented sufficiently supported the defendant's conviction for criminal vehicular homicide which required the State to prove gross negligence. The court observed that under Minnesota case law, "a sufficient degree of inattention to the road could constitute a lack of 'slight care,' that is gross negligence." 590 N.W.2d at 145. *Pelawa* presents both factual

and legal dissimilarities from the case before us and is not helpful to our determination in this case.

Under the facts presented here, Krovvidi's actions of running a red light without more does not as a matter of law meet the "material deviation" element required for a conviction of vehicular homicide under K.S.A. 21-3405. His inattentiveness does not rise to the level of a material deviation from the standard of care seen in *Trcka, Burrell,* or *Boydston.* As indicated in those cases, our conclusion in this case should not be misinterpreted, for in the cases cited, important factors were running a stop sign and inattentiveness, but with additional aggravating factors. We are unable to set forth a bright line rule as to what conduct amounts to a material deviation as set forth in K.S.A 21-3405. As indicated above, *Hickey* and *Randol* instruct us that the manner in which a defendant operates his or her vehicle under the totality of the circumstances presented is the proper focus of an inquiry concerning the element of a "material deviation" required for conviction under K.S.A. 21-3405.

In this case, there are no aggravating factors present. Krovvidi had not been drinking and was not under the influence of any drug, both factors which may provide the additional evidence to establish a material deviation. None of the passengers in his vehicle warned him as he was about to enter the intersection; none were concerned that his driving appeared reckless or that he was accelerating or speeding as he approached the intersection. Krovvidi was not speeding and proceeded through the intersection thinking his light was green. Absent additional aggravating factors, we conclude that his conduct does not amount to the material deviation required under the provisions K.S.A 21-3405.

Our answer to the two questions posed above provides an answer to the remaining errors assigned by the defendant. In any event, the remaining assigned errors are rendered moot by our opinion.

Reversed and remanded with instructions to vacate the sentence.