NOT DESIGNATED FOR PUBLICATION

No. 117,883

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ETHAN MARK BUTTS,
*Appellant*.


MEMORANDUM OPINION

Appeal from Riley District Court; MERYL D. WILSON, judge. Opinion filed June 8, 2018.
Affirmed.

*David A. Vinduska* and *Andy Vinduska,* of Manhattan, for appellant.

*James W. Garrison*, assistant county attorney, *Barry Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., HILL and BUSER, JJ.

PER CURIAM:  Ethan Mark Butts appeals his vehicular homicide conviction. Butts contends there was insufficient evidence to support the necessary element of "a material deviation from the standard of care which a reasonable person would observe under the same circumstances" which is required for a conviction of vehicular homicide under K.S.A. 2015 Supp. 21-5406(a). Upon our review, we find sufficient evidence in support of the conviction and, therefore, affirm the jury's verdict.

1

On February 13, 2016, Butts failed to stop at red traffic lights protecting a highway intersection and struck a vehicle driven by 30-year-old Jenna Lindsten. Lindsten died as a result of the collision. Butts was charged with vehicular homicide, and a jury trial was held on May 10, 2017.

During trial, Kansas Highway Patrol Trooper Wilmer Baquero, Jr. testified that on February 13, 2016, about 11:05 a.m., he was dispatched to a collision at the intersection of Tuttle Creek Boulevard and Marlatt Avenue. When he arrived at the scene, Trooper Baquero observed a semitrailer truck with heavy front end damage. Butts had been operating the semitrailer truck and was traveling southbound on Tuttle Creek Boulevard. The trooper also saw a white SUV with heavy driver's side damage. Lindsten had been driving the white SUV eastbound on Marlatt Avenue when Butts struck her vehicle broadside at the intersection.

Tuttle Creek Boulevard is also known as U.S. Highway 24. It is a major, four-lane divided highway running in a north/south direction. The highway has turn lanes to allow a motorist to travel to the east or west on Marlatt Avenue. The speed limit for Tuttle Creek Boulevard is 55 mph. As Butts traveled southbound approaching Marlatt Avenue, there were five traffic signals protecting the intersection. One overhead traffic signal controlled vehicles turning eastbound onto Marlatt Avenue. Three other overhead traffic signals regulated two lanes of southbound traffic. One traffic signal, attached to a light pole, appears to have also regulated southbound traffic turning westbound onto Marlatt Avenue.

As Butts traveled southbound towards the intersection, the highway was straight and he would have had a view of the intersection from about a mile away. A semitrailer

2

truck driver traveling southbound would have had a continuous unobstructed view of the overhead traffic signals at the intersection. There were two sets of signs on each side of the highway that warned southbound motorists that traffic signals were one half mile ahead. Another set of signs was located .3 miles north of the intersection and warned southbound drivers to "BE PREPARED TO STOP."

Marlatt Avenue is a road running in an east/west direction. At the intersection with Tuttle Creek Boulevard, there are three lanes for eastbound traffic. The road has two turn lanes to allow a motorist to travel either to the north or south at the intersection with Tuttle Creek Boulevard. A third lane runs between the two turn lanes for traffic continuing to travel eastbound or westbound. As Lindsten traveled eastbound in the middle lane, approaching Tuttle Creek Boulevard, there were four traffic signals protecting the intersection. One overhead traffic signal controlled vehicles turning north onto the highway. Two other overhead traffic signals regulated one lane of eastbound traffic. One traffic signal, attached to a light pole, appears to have also regulated eastbound traffic turning south onto Tuttle Creek Boulevard.

On the day of the collision, it was a clear, cold day with an overcast sky and dry roadways. Trooper Baquero's investigation revealed that Butts was traveling southbound in one of the two through lanes which was closest to the median, had failed to stop at the red traffic signals protecting the intersection, veered to the left at or near the point of impact, and struck the driver's side of Lindsten's vehicle. The trooper opined that upon entering the intersection Butts was traveling "at least 55" miles per hour.

Upon impact, Lindsten's vehicle began spinning and hit a pickup truck owned by Quinton Huncovsky. Trooper Baquero determined that the only evidence of any braking by Butts was when he applied "some brakes" while already in the intersection. The semitrailer truck Butts was driving weighed over 78,000 pounds. Trooper Baquero

3

opined that the stopping distance for a semitrailer truck of that weight traveling 55 miles per hour is typically between 250 to 350 feet, or "almost the length of a football field."

Trooper Baquero testified that Butts was required to do a pre-trip inspection of his semitrailer truck, and that Butts told the trooper that he had, in fact, done the inspection. After the collision, an inspection of the semitrailer truck revealed that three of the brakes on the trailer were out of adjustment. According to Trooper Baquero, "If [Butts] would have checked them [*sic*] brakes correctly he would have realized that the brakes on the trailer were out of adjustment." Trooper Baquero advised that if Butts' semitrailer truck had been inspected prior to the accident by the Kansas Highway Patrol "that truck would have been put out of service to begin with."

Trooper Baquero interviewed Butts after the collision. Butts advised that he drove the semitrailer truck as a commercial motor vehicle for Nelson Poultry Farms. He also advised that he didn't remember his speed upon approaching the intersection, but that he was following another Nelson Poultry Farms semitrailer truck. According to the trooper, Butts related that, "he wasn't trying to keep up with the vehicle, but he was trying to stay on the vehicle." Butts informed Trooper Baquero that he was familiar with the intersection and he had "to screech tires at that intersection before." In clarifying that remark, the trooper testified that Butts said he previously had come to an abrupt stop at the intersection.

Butts told Trooper Baquero that he did not believe he was at fault for causing the collision. Butts said that he thought he had the green light and did not see Lindsten's vehicle until the last second. When asked what he would have done differently to avoid the collision, Butts told Trooper Baquero that he probably would have slowed down and been more attentive.

4

Trooper Baquero's investigation revealed that Lindsten was traveling about 30 miles per hour upon her approach to the intersection. According to the trooper, "she would have been slightly west of the intersection coming toward the intersection when the light turned green, and she just continued through."

At trial, Huncovsky testified that he was driving his pickup truck northbound on Tuttle Creek Boulevard towards the Marlatt intersection when the traffic signals turned yellow. Huncovsky stopped at the intersection, looked down at his vehicle's radio, and was manipulating the tuner. After a couple seconds, Huncovsky heard the collision. He then looked up and saw Lindsten's vehicle coming towards him. Huncovsky was sure the traffic signal was red by the time the accident occurred because he had been stopped at the intersection for a couple of seconds prior to the collision.

Another witness to the accident, Alec Begnoche, also testified at trial. Begnoche was driving a vehicle eastbound on Marlatt Avenue, the same direction as Lindsten. Begnoche was in the left turn lane and stopped at the red traffic signal. After about five seconds, the traffic signals for eastbound traffic turned green and Begnoche began to drive forward. Lindsten's vehicle was pulling up to the intersection next to Begnoche as the traffic signals turned green.

After Begnoche started driving into the intersection, "I looked both ways even before I pulled out I saw [Butts] coming from probably about a hundred feet or so, and I looked again to make sure he was stopping, and he wasn't stopping." Begnoche stopped in the intersection, and as Butts drove into the intersection, he missed striking the front end of Begnoche's vehicle by about a foot. Lindsten's vehicle, which was traveling next to Begnoche's vehicle, entered the intersection and was then struck by Butts' semitrailer truck, and sent spiraling across the intersection. Begnoche surmised that Lindsten was unable to see the oncoming semitrailer truck because the positioning of his pickup truck blocked her view.

5

Elizabeth Madsen testified that she was traveling southbound on Tuttle Creek Boulevard on the day of the collision. Before reaching the intersection, Madsen was about four or five car lengths behind Butts and was driving the speed limit of 55 miles per hour. Madsen saw there was another semitrailer truck in front of Butts. While Madsen was following Butts, he increased his speed which caused the distance between their vehicles to increase. Madsen recalled that the traffic signal lights were red when Butts entered the intersection. Of note, Madsen did not see Butts activate his brake lights until after the collision, when his semitrailer truck was past the intersection and it was "fish-tailing over the median." When asked if there were some circumstances that she believed caused the collision, Madsen testified that Butts was following the semitrailer truck in front of him, and it appeared that Butts was "trying to keep up with the truck in front of him."

The jury found Butts guilty of vehicular homicide and he was sentenced to 12 months in jail. Butts appeals.

## SUFFICIENCY OF THE EVIDENCE

On appeal, Butts contends there was insufficient evidence at trial to support his vehicular homicide conviction. Specifically, Butts argues that "his action of running a red light, without more, was insufficient to prove beyond a reasonable doubt that he materially deviated from the standard of care a normal person would exercise under the same circumstances."

Our standard of review provides:

> "When the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the

6

credibility of witnesses. [Citations omitted.]" *State v. McClelland*, 301 Kan. 815, 820, 347 P.3d 211 (2015).

The evidence at trial was both direct and circumstantial. A verdict may be supported by circumstantial evidence if that evidence provides a basis for a reasonable inference by the fact-finder regarding the fact in issue. Circumstantial evidence, to be sufficient, need not exclude every other reasonable conclusion. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016).

Vehicular homicide is defined in K.S.A. 2015 Supp. 21-5406(a), which provides:

"Vehicular homicide is the killing of a human being committed by the operation of an automobile . . . in a manner which creates an unreasonable risk of injury to the person or property of another and which constitutes a material deviation from the standard of care which a reasonable person would observe under the same circumstances."

"A 'material deviation' as used in [the vehicular homicide statute] is conduct amounting to more than simple or ordinary negligence and yet it is conduct not amounting to gross and wanton negligence." *State v. Krovvidi*, 274 Kan. 1059, 1069, 58 P.3d 687 (2002); see K.S.A. 2015 Supp. 21-5406(c). The totality of the circumstances must be considered when determining if the manner in which the defendant operated his or her vehicle amounted to a material deviation from ordinary due care. *Krovvidi*, 274 Kan. at 1069.

To support his position, Butts relies on our Supreme Court's decision in *Krovvidi*. In *Krovvidi*, the court found the defendant's action of inattentively violating a red traffic signal without more was not a material deviation from the ordinary standard of care, holding that "[a]bsent additional aggravating factors, we conclude that his conduct does not amount to the material deviation required." 274 Kan. at 1075.

In dicta, the *Krovvidi* court identified examples of aggravating factors that could elevate simple negligence to a material deviation. 274 Kan. at 1075. These examples included: drinking, drug use, ignored warnings from a passenger, reckless driving, accelerating while approaching an intersection, and speeding. 274 Kan. at 1075. The examples identified by the court in *Krovvidi* were not intended to be exhaustive. *State v. Carter*, No. 101,510, 2010 WL 174062, at *5 (Kan. App. 2010) (unpublished opinion).

Unlike the circumstances in *Krovvidi*, when viewing the evidence in this case in the light most favorable to the State, there were additional aggravating factors present—apart from simple inattentiveness—which support the jury's finding that Butts materially deviated from the usual standard of care when he violated the red traffic signals and, as a result, collided with and killed Lindsten.

First, there was direct and circumstantial evidence that Butts was traveling at an unsafe speed which did not allow his semitrailer truck sufficient time or distance to stop for the red traffic signals. In this regard, Butts' semitrailer truck weighed over 78,000 pounds, and traveling at 55 miles per hour required a stopping distance of 250 to 350 feet. The uncontroverted evidence was that Butts, although amply warned one half mile prior to the intersection that traffic signals were ahead and .3 miles prior to the intersection that he should "BE PREPARED TO STOP," traveled at an unsafe speed which did not allow him the necessary time or distance to stop his heavy commercial vehicle in the event the traffic signal lights turned red. This driving behavior was an aggravating factor, apart from any inattentiveness to the red signals, because it precluded Butts from being able to stop prior to entering the intersection *even if he was attentive* to the traffic signals or Lindsten's vehicle. Indeed, after the accident Butts acknowledged that he should have slowed down upon approaching the intersection. In short, Butts' failure to heed the warning signs and his failure to operate the commercial vehicle at a speed that would have allowed him to stop in a timely manner was an aggravating factor in the deviation

from the standard of care a reasonable person would observe when approaching the traffic signals.

Second, when determining whether a material deviation occurred, the totality of the circumstances may include the fact that the defendant is a professional commercial truck driver. *State v. Miser*, No. 99,274, 2009 WL 1691940, at *13 (Kan. App. 2009) (unpublished opinion). "[F]or a professional driver to be oblivious to his surroundings while propelling a semitrailer truck down a highway at 50 to 55 miles per hour is closer to reckless and wanton conduct than to simple negligence." *State v. Trcka*, 20 Kan. App. 2d 84, 88, 884 P.2d 434 (1994).

Butts was a commercial truck driver. According to Trooper Baquero, Butts was required to conduct a pre-trip inspection, which included inspection of all brakes on his commercial vehicle. Butts told the trooper he had conducted the required examination, yet a post-collision examination revealed that three of the brakes were out of adjustment and, as a result, the semitrailer truck should not have been operating on a Kansas highway. A reasonable inference from the evidence is that Butts either did not conduct a pre-trip inspection, conducted it negligently, or noticed the brake adjustment problems but nevertheless operated his semitrailer truck on the day of the collision. Regardless, this evidence at least suggests Butts' inattentiveness towards the safe operation of his semitrailer truck with properly adjusted brakes.

Moreover, Butts was familiar with the intersection and had previously made an abrupt stop at the intersection. Given this past experience, a reasonable person would have been especially attentive to the warning signs, traffic signals, semitrailer truck's speed, crossing traffic, and the condition of the truck's brakes. Butts' failures and omissions, given that he was a professional commercial truck driver, surely created an unreasonable risk of injury to Lindsten and was a material deviation from a reasonable person's standard of care.

9

Finally, a driver's intent to purposely violate a red traffic signal is important evidence of a material deviation from a reasonable standard of care. *Carter*, 2010 WL 174062, at *5 ("If Carter intentionally ran the stop sign, his conduct would undoubtedly be a material deviation from the ordinary standard of care.") Although Butts claimed the traffic signal was green at the time he entered the intersection, reviewing the trial evidence in a light most favorable to the State shows that there was some proof from which the jury could have concluded that Butts intended to violate the red traffic signals.

Butts told Trooper Baquero that at the time of the collision he was trying to stay with the other Nelson Poultry Farms semitrailer truck ahead of him. Trooper Baquero opined that upon entering the intersection Butts was traveling "at least 55" miles per hour. Madsen testified that while following Butts she was driving the speed limit, yet the distance between Butts and her vehicle had increased as the semitrailer truck approached the intersection. In fact, she thought that Butts had sped up, suggesting that he was exceeding the speed limit of 55 miles per hour. Based on her observations, Madsen testified to her lay opinion that the collision was caused by Butts following the semitrailer truck which had already entered the intersection, and trying to keep up with the truck. In sum, based on this testimony, the jury could reasonably infer that Butts had observed the red traffic signals but purposely decided not to apply his brakes or slow down, but to violate the red traffic signals in order to remain closely following the leading semitrailer truck through the intersection.

In conclusion, the evidence, when viewed in a light most favorable to the State, was sufficient for a rational fact-finder to find that Butts operated his semitrailer truck in a manner which created an unreasonable risk of injury to Lindsten and constituted a material deviation from the standard of care which a reasonable person would have observed under the same circumstances.

Affirmed.