NOT DESIGNATED FOR PUBLICATION

No. 123,009

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TITO N. KYANDO,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ROBERT J. FLEMING, judge pro tem. Opinion filed January 14, 2022. Affirmed.

*Debra J. Wilson*, of Capital Appeals and Conflicts Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before WARNER, P.J., MALONE and BUSER, JJ.

BUSER, J.: Tito N. Kyando was convicted by a jury of two counts of involuntary manslaughter. He raises four issues on appeal. First, he contends the district court erred when it did not allow him to cross-examine a witness for bias. Second, he claims error because his requested jury instruction on proximate cause was not provided to the jury. Third, Kyando asserts that cumulative error deprived him of a fair trial. Finally, he argues that there was insufficient evidence to support the jury's verdicts. Upon our review, we find no reversible error. Accordingly, we affirm.

1

On the afternoon of September 4, 2018, police officers and firefighters from the Wichita Police Department and Wichita Fire Department responded to the scene of a vehicular collision at an intersection in Wichita. The collision occurred when a Chevrolet Trailblazer driven by Kyando struck the passenger's side of a Ford Fiesta driven by Uriel Salabao with Miyah Latney in the passenger's seat.

Prior to the collision, at about 2:05 p.m., Kyando, who worked as a semi-trailer-truck driver, went to his vehicle and discovered that the cooling unit in the trailer had stopped operating. This concerned Kyando because the trailer unit was full of refrigerated goods, which could spoil without proper cooling. Since he needed fuel to restart the cooling unit, Kyando borrowed his girlfriend's Trailblazer and drove towards a gas station.

Just before 2:30 p.m., Kyando drove eastbound on 31st Street approaching the Turnpike Drive intersection. Of note, a short distance to the west of the intersection is a bridge overpass which creates a hill that obstructs the view for eastbound motorists travelling towards the intersection. As Kyando drove on 31st Street, he saw three vehicles in the westbound lane turning left at the intersection with Turnpike Drive. The road conditions were normal and dry. For vehicles that traveled westbound, the stoplight at the intersection was equipped with a green arrow, which gave the vehicles in the turn lane the right of way, and a green light, which indicated that cars in the turn lane should yield to oncoming traffic.

Kyando told Officer Rebekah Jabara he had the green light as he approached the intersection, but the three oncoming vehicles turned in front of him, making their turns one after another. As recorded on the officer's body camera, Kyando told Officer Jabara that as he approached the intersection he saw the first vehicle make the left-hand turn.

2

Upon seeing the second vehicle make the left-hand turn he said, "[O]h shit!" or words to that effect. When the third vehicle, driven by Salabao, entered the intersection he was concerned that a collision was inevitable. According to Kyando, as he drove closer to the intersection, he tried to brake, but his foot slipped from the brake pedal and pressed on the gas pedal. He then collided with the last of the three oncoming vehicles driven by Salabao, striking it on the passenger's side. Both Salabao and Latney suffered blunt force injuries in the collision which resulted in their deaths.

Lieutenant Marc Haneberg of the fire department contacted Kyando at the scene. Lieutenant Haneberg saw Kyando bleeding from his head and thought he appeared a bit disoriented but cogent. Kyando was transported by ambulance to the hospital.

Sergeant James Bray conducted the police department's investigation of the collision. Since 2008 the officer was a member of the police department's critical accident team with the responsibility for gathering evidence at the scene and conducting accident reconstructions. From 2015 to 2018, Sergeant Bray was assigned as a detective to the accident follow-up unit which investigated major vehicular accidents involving serious injuries or deaths.

Sergeant Bray interviewed Kyando at the hospital after he was released. Kyando informed the officer that he was a commercial truck driver who was familiar with the rules of the road. Kyando told Sergeant Bray "he was going 35 to 40 miles an hour, very insistent on that, that he was only going 35 to 40 miles an hour, the same speed as regular traffic." Kyando admitted to being in a hurry so he could return the Trailblazer to his girlfriend. According to Kyando, he was in a hurry because he needed to obtain the gas can and return the Trailblazer by 2:30 p.m. so his girlfriend could go to work. Of note, the police dispatcher received a call regarding the collision at 2:25 p.m.

3

Sergeant Bray, an accredited accident reconstruction expert, told Kyando that, in his opinion, the damage to the vehicles indicated that the Trailblazer was traveling more than 40 miles per hour—the speed limit on 31st Street—at impact. Even so, Kyando insisted that he drove the speed limit. At trial, Sergeant Bray testified that "based on the damage to the Ford Fiesta and [Kyando's] car and how far the cars traveled after impact . . . . When we walked up there we knew it was not a 40-mile-an-hour crash."

Both vehicles involved in the collision were manufactured with event data recorders. These devices record technical data regarding the vehicle's operation shortly before, during, and after a collision. Informally, such devices are analogous to "black box" devices installed in airplanes. Sergeant Bray, who had training in the devices, downloaded the event data recorder information from both vehicles and conducted a reenactment to replicate what the drivers would have been able to observe shortly before the collision.

The event data recorders revealed the speed at which both drivers operated their vehicles approximately five seconds before the crash:

| Seconds Before Accident | Kyando's Speed | Salabao's Speed |
|---|---|---|
| 5 | 87 miles per hour | 7 miles per hour |
| 4 | 88 miles per hour | 6 miles per hour |
| 3 | 88 miles per hour | 7 miles per hour |
| 2 | 88 miles per hour | 10 miles per hour |
| 1 | 80 miles per hour | 13 miles per hour |
| Time of Impact | 68 miles per hour | 16 miles per hour |

About 5 seconds prior to impact the event data recorder indicated the Trailblazer was operating at 94 percent throttle which was consistent with a fairly strong push on the accelerator. At 4 seconds before impact the Trailblazer was traveling at 88 miles per hour

with a 63 percent throttle, consistent with Kyando lessening the pressure on the accelerator. Approximately 3 seconds prior to impact, the Trailblazer continued traveling at 88 miles per hour but with zero percent throttle indicating that Kyando's foot was off the accelerator. About 2 seconds prior to impact, the Trailblazer continued traveling at 88 miles per hour with 28 percent throttle indicating force was, once again, being applied to the accelerator. About 1 second prior to impact, the event recorder indicated that while the Trailblazer was slowing down from 80 to 68 miles per hour, Kyando's foot was off the accelerator and the brakes were applied.

Numerous photographs and videos were admitted in evidence at trial. These photographs depicted the area surrounding the site of the collision and the probable views that Kyando and Salabao had upon their approach to the intersection. In a recreation of the collision, Sergeant Bray correlated the photographs with the event data recorder readings to show the respective views of both drivers in the 5 seconds prior to the collision. In particular, the recreation showed that when Salabao's Fiesta was about 75 feet from the point of impact, the Trailblazer was about 499 feet from the point of impact.

At trial, a recording from two external video cameras located at a nearby business, AAA Towing, was shown to the jury which memorialized in real time the speed of the approach of Kyando's vehicle as it traveled on 31st Street towards the intersection. According to Sergeant Bray, the video was consistent with the speed readings from the event data recorder.

Kyando was charged with two counts of involuntary manslaughter in violation of K.S.A. 2018 Supp. 21-5405(a)(1). The State also charged Kyando in the alternative with two counts of vehicular homicide in violation of K.S.A. 2018 Supp. 21-5406. At the conclusion of trial, the jury found Kyando guilty of both counts of involuntary manslaughter. The district court later sentenced Kyando to 36 months of probation, with underlying concurrent sentences of 32 months' imprisonment.

Kyando timely appeals.

## CROSS-EXAMINATION

Sergeant Bray testified on behalf of the State regarding responding to the scene of the accident, the data retrieved from the event data recorders, and the opinions he formed based on that data. During cross-examination, Sergeant Bray testified that law firms occasionally hired him to do accident reconstruction work in civil lawsuits. After confirming that Sergeant Bray had been hired by one firm, DeVaughn James, seven or eight times, Kyando followed with, "I'm presenting to you what's been provided in evidence as documentation showing that the Law Offices of DeVaughn James represent the estate of Ms. Salabao." At that point, the State objected to the relevance of the question.

In a colloquy at the bench, defense counsel argued that he should be able to cross-examine Sergeant Bray regarding his work for that law firm because K.S.A. 60-420 allows him to cross-examine a witness about any matter relevant to credibility. The district court then asked if defense counsel was suggesting that Sergeant Bray's testimony lacked credibility because he worked for the Salabao family. Defense counsel responded, "No." The State then informed the district court that Sergeant Bray did not work for the Salabao family, and the law firm had not retained him in the civil case. Defense counsel responded, "And I haven't suggested as much. What I'm suggesting is if he's hired by the law firm that represents the family who is in this courtroom right now whose daughter died, that goes to bias because his ability to get a conviction here helps that law firm." The district court sustained the State's objection, finding the question was irrelevant.

On appeal, Kyando contends the district court erred when it did not allow him to cross-examine Sergeant Bray regarding his prior work for the DeVaughn James law firm. He raises both statutory and constitutional claims of error, although he acknowledges that

6

during the trial he only advanced a statutory argument. Regardless, he argues our court should consider his constitutional claim for the first time on appeal. We will consider these claims individually.

*Statutory Claim of Error*

We begin with our standard of review:  "Because a district court may exercise reasonable control over the scope of cross-examination, appellate courts review the court's decision to limit cross-examination for an abuse of discretion." *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018). Kyando claims the district court abused its discretion by making an error of law in not permitting cross-examination of Sergeant Bray regarding his "potential bias." As the party asserting the abuse of discretion, Kyando bears the burden to demonstrate such abuse. *Thomas*, 307 Kan. at 739.

K.S.A. 60-420 provides:

"Subject to K.S.A. 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility."

There are problems with Kyando's claim. At the outset, he has failed to provide a factual basis to evaluate this claim. The only factual basis presented to the district court regarding this issue is that Sergeant Bray had been hired by the DeVaughn James law firm on prior occasions regarding automobile accident cases. While defense counsel handed Sergeant Bray a document purporting to show that the law firm represented the estate of Ms. Salabao, there was no proffer of this document to the district court, and we

7

are unaware of its contents. This is important because "[a] party being limited by the exclusion of evidence must sufficiently proffer the substance of that evidence to preserve the issue for appeal." *State v. Davis*, 312 Kan. 259, Syl. ¶ 6, 474 P.3d 722 (2020).

Moreover, assuming the law firm did represent the Salabao estate, there was no showing that the estate had filed a personal injury lawsuit against Kyando because of this collision or that Sergeant Bray had been hired by the law firm on behalf of the Salabao family. To the contrary, defense counsel conceded that the law firm had not hired Sergeant Bray to work on any lawsuit involving the estate. All things considered, Kyando has not provided a sufficient factual basis to attack Sergeant Bray's credibility.

Second, Kyando's claim of bias is grounded in speculation. He claims:

"The *potential* bias here is based on Sergeant Bray's business relationship with a law firm with a financial interest in this litigation. A finding of guilt in the criminal matter would serve the firm's interests in the civil litigation. While Sergeant Bray was not involved in the particular civil litigation and did not stand to benefit directly from it, he had an interest in maintaining his relationship with the law firm." (Emphasis added.)

But Kyando proffered no evidence that Sergeant Bray had a current business relationship with the law firm. No information was provided regarding when Sergeant Bray had previously been hired by the law firm, or whether he currently was working with the law firm, or whether he even had "an interest in maintaining his relationship with the law firm." Without any such factual basis we are left with only assumptions and conjecture.

Additionally, Kyando does not explain how a finding of guilt in the criminal case would have affected a civil lawsuit brought by the Salabao estate. The criminal and civil litigation processes are separate and not interconnected. Failure to support a point with

8

pertinent authority or show why it is sound despite a lack of supporting authority is akin to failing to brief the issue. *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019).

Kyando cites *Thomas* in support of his argument. In *Thomas*, a jury convicted the defendant of one count of aggravated battery with a deadly weapon against a coworker, Traci Borntrager. During cross-examination, Thomas asked Borntrager whether she had sued their employer following the fight. The State objected on relevancy grounds, and the district court sustained the objection. Before the State lodged its objection, however, Borntrager told the jury she had sued the employer. Outside the presence of the jury, the State proffered that Borntrager filed a civil claim that had been settled for $5,000. The computer records confirmed the suit had been dismissed. The district court then ruled the testimony was not relevant. On appeal, Thomas argued the district court violated her constitutional right to confront the State's witnesses.

Our Supreme Court stated that "an ongoing civil lawsuit involving the defendant and affecting the pecuniary interests of the State's witnesses is relevant impeachment evidence that may be explored on cross-examination during the criminal trial." 307 Kan. at 739-40. In *Thomas*, the civil lawsuit at issue had settled. But the Supreme Court held that Thomas had not demonstrated how the existence or factual details of the civil lawsuit could have provided a basis to impeach the victim's testimony and, therefore, the district court had not abused its discretion. Moreover, our Supreme Court observed:

> "Finally, our review is hampered by the fact that Thomas never made a proffer on the record regarding the civil lawsuit. '[A]n appellate court may not speculate as to what may have existed at the time of the hearing but rather must consider the evidence of record and base its decisions on facts in the record.'" 307 Kan. at 741 (quoting *Cross v. Kansas Dept. of Revenue*, 279 Kan. 501, 513, 110 P.3d 438 [2005]).

*Thomas* provides scant support for Kyando's argument. Unlike *Thomas*, Sergeant Bray was not a complaining witness against Kyando. As a result, unlike *Thomas*, wherein

the victim of the aggravated battery ostensibly had a motive to be biased in her testimony against the defendant, no such motive is apparent here. Lastly, there is one similarity in the *Thomas* case and the case on appeal—in both cases the criminal defendant did not make a sufficient showing that the civil litigation had any effect on the credibility of the witness in the criminal trial.

In summary, Kyando's contention is unavailing. He does not advance any arguments that challenge the accuracy of the work Sergeant Bray performed in this case which could suggest a bias against Kyando. He asked the district court to speculate as to the "potential" bias Sergeant Bray might have because the law firm that had previously hired him in civil lawsuits was retained by the Salabao family. But, as conceded by Kyando, the law firm had not hired Sergeant Bray to work on the fatality collision, nor apparently filed any litigation on behalf of the Salabao family. Based on our Supreme Court's admonition against such speculation, we are persuaded that the district court did not abuse its discretion when it did not allow Kyando to cross-examine the witness on this issue. See 307 Kan. at 741.

*Constitutional Claim of Error*

Kyando also argues that the district court's limitation of his cross-examination violated his right to confront witnesses under the Sixth Amendment to the United States Constitution. As we have noted, Kyando did not raise this issue at trial. Generally, constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). But there are several exceptions to the general rule, including: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the district court was right for the wrong reason. *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019).

Kyando relies on the second exception, arguing that "the constitutional right of cross-examination is an 'elementary component of judicial fairness.' *Adams v. Marshall*, 212 Kan. 595, Syl. ¶ 5, 512 P.2d 365 (1973)." The State, however, argues that this court should not consider Kyando's constitutional claim because he failed to raise this question to the district court.

There are two reasons why Kyando's constitutional claim is not properly before us. First, as we have already explained, Kyando did not provide a meaningful proffer at trial of his claim of bias. See K.S.A. 60-405. Without this proffer, Kyando's argument cannot be reviewed on appeal. See *State v. Hillard*, 313 Kan. 830, 839, 491 P.3d 1223 (2021). Second, Kansas courts have consistently held that a party may not seek to admit evidence on one ground at trial and then offer a new (and different) ground for its admissibility on appeal. See *State v. Richmond*, 289 Kan. 419, 428, 212 P.3d 165 (2009). This practice would undermine the requirement that parties present their specific grounds for objection to the district court.

In *State v. Solis*, 305 Kan. 55, 62, 378 P.3d 532 (2016), our Supreme Court reaffirmed that it did not intend "to deviate from the requirement" of a timely and specific objection at trial "in order to preserve an evidentiary issue for appellate review." Our Supreme Court also noted it had "specifically refused to allow the contemporaneous objection rule to be circumvented by the caselaw exception that is designed to serve the ends of justice or prevent a denial of a fundamental right." 305 Kan. at 63 (citing *State v. Randolph*, 297 Kan. 320, 335, 301 P.3d 300 [2013]).

Kyando cites no cases in support of the proposition that appellate courts should consider evidentiary issues relating to cross-examination without requiring those specific issues to be first presented at trial. This constitutional issue was not preserved for appellate review, and we decline to consider it.

11

Kyando contends the district court erred when it failed to provide the jury with his proposed instruction on proximate cause. According to Kyando, his "theory of defense was that he did not cause the deaths of Ms. Salabao and Ms. Latney because the fatal accident was due to Ms. Salabao's failure to yield the right of way." In response, the State contends that the subject of proximate cause was adequately addressed in the elements instructions for the crimes of involuntary manslaughter.

Our standards of review:

"When analyzing jury instruction issues, we follow a three-step process: '(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.'" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

At the second step, appellate courts consider whether the instruction was legally and factually appropriate. *McLinn*, 307 Kan. at 318. Appellate courts use unlimited review to determine whether an instruction was legally appropriate. *State v. Johnson*, 304 Kan. 924, 931, 376 P.3d 70 (2016). Additionally, courts should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction. *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016).

Before trial, Kyando requested the following instruction:

> "In order to find Mr. Kyando guilty in Count 1 of Involuntary Manslaughter, the State must establish beyond a reasonable doubt that Mr. Kyando's conduct was the proximate cause of Uriel Salabao's death.
>
> "The 'proximate cause' or legal cause of an injury is that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act."

Kyando also requested the same instruction for the involuntary manslaughter charge involving Latney, and similar proximate cause instructions for the lesser included offenses of vehicular homicide. At trial, during the jury instructions conference, Kyando again requested proximate cause instructions, which the district court denied. As a result, Kyando preserved this issue for our review.

During the jury instructions conference, the district judge, in denying Kyando's requested instructions, stated:

> "I think you've got [a proximate cause instruction.] If you look at the Instruction Number 3 on burden of proof, the test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to any of the claims required to be proved by the State, you should find the defendant not guilty. The[n] when you look at the charging instructions it tells the jury specifically what the State must prove."

The elements or charging instruction pertaining to the involuntary manslaughter of Salabao provided:

> "In Count 1, the defendant is charged with Involuntary Manslaughter. The defendant pleads not guilty.

13

"To establish this charge, each of the following claims must be proved:

1.      The defendant killed Uriel Salabao

2.      The killing was done recklessly.

3.      This act occurred on or about the 4th day of September, 2018, in Sedgwick County, Kansas.

"A defendant acts recklessly when the defendant consciously disregards a substantial and unjustifiable risk that a result of the defendant's actions will follow. This act by defendant disregarding the risk must be a gross deviation from the standard of care a reasonable person would use in the same situation."

The elements or charging instruction pertaining to the involuntary manslaughter of Latney was identically worded. Defense counsel did not object to the elements instructions for involuntary manslaughter and vehicular homicide.

The district court stated that it did not believe the jury needed a separate instruction regarding proximate cause because the instructions given were clear. The district court also stated that "to give the [requested] instruction . . . *would be confusing, to say the least*." (Emphasis added.)

To convict Kyando of involuntary manslaughter, the State was required to prove that he killed Salabao and Latney while acting recklessly. See K.S.A. 2018 Supp. 21-5405(a)(1). In other words, the State had to prove that Kyando's actions were the proximate cause of Kyando's death. See *State v. Bale*, 39 Kan. App. 2d 655, 660, 182 P.3d 1280 (2008) (citing *State v. Anderson*, 270 Kan. 68, 72, 12 P.3d 883 [2000]. See *State v. Yowell*, 184 Kan. 352, 336 P.2d 841 [1959]; *State v. Woodman*, 12 Kan. App. 2d 110, 113-17, 735 P.2d 1102 [1987]).

To support his contention that the district court erred in not providing the jury with his requested proximate cause instruction, Kyando relies on *State v. Chastain*, 265 Kan. 16, 960 P.2d 756 (1998), and *State v. Collins*, 36 Kan. App. 2d 367, 138 P.3d 793 (2006).

14

In *Chastain*, the State charged Chastain with involuntary manslaughter based on an automobile collision which resulted in the death of Robert Glenn. As summarized by our Supreme Court: "At trial, the defendant argued that Glenn caused his own death by proceeding into the intersection without stopping at a stop sign. The State claimed the defendant was operating his vehicle at a high rate of speed under the influence of alcohol, causing Glenn's death." 265 Kan. at 17-18. The jury ultimately convicted Chastain of the lesser included offense of driving while under the influence of alcohol.

During jury deliberations, the jury asked the district court whether it should consider the fault of each driver "when interpreting the phrase 'unintentionally killed' in involuntary manslaughter, K.S.A. 21-3404 [now codified at K.S.A. 2018 Supp. 21-5405], and vehicular homicide, K.S.A. 21-3405 [now codified at K.S.A. 2018 Supp. 21-5406], as a lesser included offense of involuntary manslaughter." 265 Kan. at 23. The district court responded to the jury's question by advising that it should consider Glenn's fault, or lack thereof, as a circumstance to be considered with all the other evidence to determine whether Chastain's conduct did or did not directly cause Glenn's death.

On appeal, the State contended that the district court inaccurately instructed the jury that contributory negligence was a defense. Our Supreme Court agreed with the district court's response to the jury's question. Citing *State v. Betts*, 214 Kan. 271, 278, 519 P.2d 655 (1974), our Supreme Court explained that, while contributory negligence is not a defense to involuntary manslaughter, a jury could acquit a defendant of involuntary manslaughter if "it found that the victim's conduct was the *sole cause* of the death and that the defendant's drinking had nothing to do with it." (Emphasis added.) 265 Kan. at 24. Our Supreme Court also reaffirmed that both involuntary manslaughter and vehicular homicide require that the defendant's conduct was the proximate cause of the victim's death. 265 Kan. at 24-25.

In *Collins*, the defendant and a passenger left a bar around 2 a.m. in his pickup truck. He followed behind a motorcycle driven by his friend, Jesse Winsky, with Robyn Curtis also riding on the motorcycle. Winsky drove out of sight, so Collins sped up to catch up to him. Unbeknownst to Collins, while Winsky was out of sight, he parked the motorcycle in the middle of the road and went to urinate nearby while Collins remained seated on the motorcycle. By the time Collins saw the motorcycle, he tried to stop but hit the vehicle, killing Curtis. Collins was charged with involuntary manslaughter while driving under the influence of alcohol, but the jury convicted him of the lesser included offense of driving under the influence of alcohol.

On appeal, the State challenged the following portions of the jury instruction:

> "'3. That the death of Robyn Curtis occurred on the 17th day of August, 2003, as a proximate result of the operation of a vehicle by Brian Collins while under the influence of alcohol;
> "'4. That the proximate cause or legal cause of death of Robyn Curtis is that cause which in natural continuous sequence, unbroken by an intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence or result of the defendant's act . . . .'" 36 Kan. App. 2d at 368.

The State argued that the proximate cause instruction changed the elements of the crime. 36 Kan. App. 2d at 368. After discussing our court's ruling in *State v. Creamer*, 26 Kan. App. 2d 914, 996 P.2d 339 (2000), and our Supreme Court's rulings in *Chastain*, our court concluded that the district court did not err in instructing the jury on proximate cause. 36 Kan. App. 2d at 369-72. However, our court criticized the particular proximate cause instruction given by the district court:

> "Nevertheless, the manner in which the court instructed the jury on proximate cause was confusing. Instead of adding paragraphs 3 and 4 to the elements instruction,

16

the trial court should have instructed the jury: 'The fault or lack of fault of Robyn Curtis is a circumstance to be considered along with all the other evidence to determine whether the defendant's conduct was or was not the direct cause of Robyn Curtis' death.' See *Chastain*, 265 Kan. at 25, 960 P.2d 756. Given the evidence of Curtis' fault and consistent with *Chastain*, such an instruction would have been warranted in this case. In a case without this evidence, however, the trial court should use PIK Crim.3d 56.06-A, without any modification, to instruct the jury on the crime of involuntary manslaughter while driving under the influence of alcohol or drugs." 36 Kan. App. 2d at 372.

Herein lies the first problem with Kyando's argument: The proximate cause instructions Kyando requested were identical to the instruction given in *Collins* that our court criticized as being confusing. See 36 Kan. App. 2d at 368, 372. Similarly, the district court here described Kyando's requested proximate cause instructions as "confusing, to say the least."

Kyando asserts that the "requested instruction[s], while not in the form preferred by the *Collins* Court, is the instruction approved in *Collins*, and therefore legally appropriate." The State disagrees, citing our court's ruling in *Bale*.

In *Bale*, a jury convicted Bale of involuntary manslaughter while driving under the influence of alcohol after she inadvertently backed a vehicle over her 11-year-old son, Shawn Casey. She appealed her conviction, arguing "the district court erred in failing to instruct the jury that in order to find her guilty of involuntary manslaughter, the State must establish that her conduct was the proximate cause of Casey's death and that Casey's conduct was not an intervening cause." 39 Kan. App. 2d at 659.

Our court found that Bale's arguments addressed both proximate cause and intervening cause and discussed the concepts separately. As for Bale's arguments for proximate cause, this court reaffirmed that the defendant's actions must be the proximate cause of the victim's death:

17

"This concept is adequately expressed in an instruction which provides that 'the State is required to prove that the defendant unintentionally killed the victim.' *State v. Chastain*, 265 Kan. 16, 25, 960 P.2d 756 (1998); see PIK Crim.3d 56.06-A. Bale's jury was instructed that one of the elements of the crime was '[t]hat [Bale] unintentionally killed Shawn Casey.' As stated in *State v. Scott*, 285 Kan. 366, 371, 171 P.3d 639 (2007):

> "'*Killing" connotes specific, proximate causation*-not merely a peaceful, natural death. We note that Black's Law Dictionary recognizes the word's necessary implication; "kill" means "to end life; to *cause* physical death." (Emphasis added.) Black's Law Dictionary 886 (8th ed. 2004).'"

*Bale*, 39 Kan. App. 2d at 660. (Emphasis added.)

Our court concluded: "The requirement of proximate cause was adequately expressed in the court's instruction for *the elements of the crime*. The district court did not err in failing to give a separate proximate cause instruction." (Emphasis added.) 39 Kan. App. 2d at 660.

Of note, the proximate cause instruction proposed by Kyando that we criticized in *Collins* is not found in *Chastain* or *Bale*. On the other hand, the same elements instruction given in *Bale*—which our court found was sufficient to inform the jury about proximate cause—was submitted to the jury in Kyando's case. In *State v. Crabtree*, 248 Kan. 33, Syl. ¶ 6, 805 P.2d 1 (1991), our Supreme Court held that "[e]rror cannot be predicated on the refusal to give specific instructions where those which were given cover and include the substance of those refused." We are persuaded that the elements instructions given by the district court adequately expressed the proximate cause requirement of both involuntary manslaughter and vehicular homicide. See *Bale*, 39 Kan. App. 2d at 660.

There is a second problem with Kyando's argument. Kyando asserts "there was ample evidence to find that Ms. Salabao failed to yield the right of way, and the failure to yield the right of way—not Mr. Kyando's speeding—was the proximate cause of the fatal

18

accident." In support of Kyando's claim of "ample evidence" that Salabao failed to yield the right of way, which caused the collision, he offers a three-sentence summary of facts:

> "The State offered no evidence to contradict Mr. Kyando's testimony that he had the right of way. He testified that he approached and entered the intersection where the accident occurred with the green light, and that Ms. Salabao turned left in front of him, without a protected turn signal. This meant that she was required, and failed, to yield to oncoming traffic."

Contrary to Kyando's summary (and record citations in support), Kyando did not testify at trial. There was testimony, however, that he informed police officers that he entered the intersection with a green light. There was also testimony that the traffic signal which governed Salabao's approach to the intersection allowed drivers to turn left with oncoming traffic stopped, or alternatively, turn left when oncoming traffic has a green light. Given Kyando's testimony, there was evidence that Salabao and the two vehicles which preceded her into the intersection had a green light upon Kyando's high-speed approach.

Kyando never requested a jury instruction on a driver's duty to yield to another vehicle generally, or under the circumstances shown at trial. The district court provided no such instruction, and Kyando has not raised this as an issue on appeal. Moreover, Kyando has not directed us to anywhere in the record where there was testimony that, under the circumstances established by the trial evidence, Salabao's entering the intersection was a violation of any Wichita ordinance, state statute, or contrary to a rule of the road.

On the other hand, the State presented testimony from Sergeant Bray that Salabao did not fail to yield the right of way. This issue was first addressed on cross-examination:

19

"Q. And is there any reason why, I mean, if Mr. Kyando had a green light and the other cars in the intersection they would have had to yield, correct, to the oncoming traffic?

"A. Say that again.

"Q. So if the vehicle traveling in Mr. Kyando's direction had a green light and a collision or an accident happens in the intersection, that necessarily means the vehicle making the turn failed to yield; correct?

"[THE STATE]: Objection, calls for a legal conclusion.

"THE COURT: Not only is it a legal conclusion—well, I don't think it is a legal conclusion. It is overruled.

"BY [DEFENSE COUNSEL]:

"Q. Mr. Bray, you can answer the question.

"A. So your question is if a car is turning left and gets hit by an oncoming car he must have necessarily failed to yield the right of way?

"Q. No, the question was, if a car coming from the west driving east has a green light at an intersection, there is an accident in the intersection, that does necessarily mean a vehicle failed to yield to oncoming traffic; correct?

"A. No, that doesn't. Because that's not the definition of right of way. It is a preference. If that's your question, no, it doesn't."

On redirect examination, Sergeant Bray explained the reason for his testimony that Salabao did not fail to yield the right of way:

"BY [THE STATE]:

"Q. You were asked from—you were asked about if a vehicle turns left into oncoming traffic, in other words, traffic that is coming from the opposite direction towards it, is it necessarily failing to yield the right of way? Do you recall that series of questions?

"A. I recall it.

"Q. And I believe you said that it would not necessarily be a failure to yield right of way. What do you mean by that?

"A. Well, you have to take the whole collision into account[], you know, so, yes, the vehicle turns left in front of another vehicle, the vehicle traveling at night, they have no headlights on, they could not have seen the oncoming car to turn left in front of. Certainly

20

in this case where the speed is so great it is not reasonable, nobody looks that far down the road or very, very few people do.

       "[DEFENSE COUNSEL]: Objection, he can't comment on other people.

       "THE COURT: Sustained.

"BY [THE STATE]:

"Q. Well, when you drive and you observe oncoming traffic and you're considering turning left, is there a normal distance based on the speed limit that you expect a vehicle to be within your range of concern?

"A. In a way people look down the road in terms of time, so people look down the road and they see I have a five, eight second gap, they will take that, depending on how wide the road is and that sort of thing. So we all know on 40-miles-per-hour road I need about this many seconds of a gap in order to complete that turn. Well, cars traveling about the speed limit or around that, you know where that gap is, so we don't think in terms of distance. We think in terms of seconds, so when you have somebody that's going double the speed limit, they are double the distance down, they are completely outside the area where most people look down the road, their five-to-eight-second gap."

In summary, Kyando has not shown the factual predicate for a separate jury instruction on proximate cause. In *Chastain*, there was evidence that the victim violated a stop sign and the jury, during deliberations, sought the trial court's additional instruction on causation. Here, the jury did not indicate any such equivocation about who caused the collision and made no request for clarification. In *Collins*, given the evidence, the proximate cause question was highly contested, yet our court criticized the wording of the jury instruction—the same instruction requested by Kyando. Finally, in *Bale,* our court found that—as in the case on appeal—"[t]he requirement of proximate cause was adequately expressed in the court's instruction for the elements of the crime. The district court did not err in failing to give a separate proximate cause instruction." 39 Kan. App. 2d at 660.

Here, when instructing the jury on involuntary manslaughter, the district court followed PIK Crim. 4th 54.180 (2019 Supp.) and also defined recklessly. Similarly, the

21

district court followed PIK Crim. 4th 54.190 (2019 Supp.) when instructing the jury on vehicular homicide. Our Supreme Court "'strongly recommend[s] the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions.'" *State v. Butler*, 307 Kan. 831, 847, 416 P.3d 116 (2018).

In conclusion, we find no error in the district court's rejection of Kyando's proposed instruction on proximate cause.

Next, for the sake of a complete analysis, we will consider—assuming the district court erred in declining to give a separate proximate cause instruction—whether the error was harmless.

Preliminarily, we consider our standard of review. Citing *State v. Roeder*, 300 Kan. 901, 914, 336 P.3d 831 (2014), Kyando asserts the claimed instructional error denied him his constitutional right to present a defense. Although during trial, defense counsel in argument and in questioning the State's witnesses presented his theory of defense that Kyando had the right of way, and Salabao failed to yield to oncoming traffic, we will evaluate the harmless error question employing the standard of review for a constitutional error.

When an error infringes upon a party's federal constitutional right, a court will declare a constitutional error harmless only where the party benefiting from the error persuades the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967]).

The State asserts:

> "Simply stated, Salabao's act of making a left turn from a proper turn lane at a low rate of speed was not an intervening act to break the causal chain and relieve defendant of criminal responsibility for the victims' deaths. This precise act occurs countless times every day on the streets of Sedgwick County, and, by defendant's own account, two other vehicles had done the same thing seconds before Salabao turned. Salabao's conduct was not the sole cause of the victims' deaths; she simply made what would [have] been a safe turn but for defendant's excessive and reckless speeding."

In our view there is another reason why there is no reasonable possibility that the claimed instructional error affected the verdict: In closing argument, defense counsel asked the jury to convict Kyando of both counts of the lesser offense of vehicular homicide, thus conceding the truth of the first element of that crime—that Kyando caused the women's deaths. Importantly, the first element of vehicular homicide is identical to the first element of involuntary manslaughter. In short, by urging the jury to convict Kyando of the lesser offense, defense counsel conceded the truth of the State's claim that Kyando proximately caused the women's deaths.

In his final words to the jury during closing argument defense counsel stated:

> "Again, access to justice in America is a fundamental bedrock principle. People should be found guilty of what they did, nothing more, nothing less. For those reasons, I am asking you to find Tito Kyando not guilty on two counts of involuntary manslaughter and guilty on two counts of vehicular homicide."

In response, the prosecutor highlighted the ramifications of defense counsel's admission on the issue of proximate cause:

23

"I want to point something out to you. The requirement that [Kyando] killed [Uriel Salabao and Miyah Latney] is the same in both charges. You know what that means? All that talk about the ladies being at fault doesn't matter.

"[DEFENSE COUNSEL]: Objection, that's a misstatement of the law.

"[THE STATE]: Well, if I may extend that because if they were at fault—

"[DEFENSE COUNSEL]: Is the Judge going to rule on it?

"THE COURT: I'm going to see where he's going on it. Overruled.

"[DEFENSE COUNSEL]: Okay, Judge.

"[THE STATE]: —if they were at fault for involuntary manslaughter then they are at fault for vehicular homicide.

"[DEFENSE COUNSEL]: Did the Court rule on that?

"THE COURT: I'll sustain the objection.

"[THE STATE]: Well, the difference between these two charges is [Kyando's] conduct, not theirs. There is no difference between these two charges about whether they yielded the right of way or not. Yet, the defense would have you say that they are guilty of vehicular homicide. That's what they are asking you to do. They want that. They welcome that. But we heard all this suggestion that Uriel was the one that caused this collision. She's responsible. That's inconsistent with their request to be found guilty of vehicular homicide because, if she's responsible, then he didn't commit that crime either."

Defense counsel's request that the jury convict Kyando of vehicular homicide rendered harmless any error by the district court in not giving a separate proximate cause instruction on involuntary manslaughter. In his closing argument, defense counsel effectively conceded that Kyando proximately caused the women's deaths; he simply disagreed with the State's allegation that Kyando's conduct was so egregious as to constitute recklessness as defined in the elements instruction.

CUMULATIVE ERROR

Kyando contends the cumulative effect of the trial errors requires this court to reverse the district court's judgment.

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Hirsh*, 310 Kan. 321, 345, 446 P.3d 472 (2019). In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. 310 Kan. at 345-46. If any of the errors being aggregated are constitutional in nature, their cumulative effect must be harmless beyond a reasonable doubt. *State v. Robinson*, 306 Kan. 1012, 1034, 399 P.3d 194 (2017).

As discussed earlier, we have not found any trial errors in this case. As a result, the cumulative error doctrine does not apply. See *State v. Lemmie*, 311 Kan. 439, 455, 462 P.3d 161 (2020) (When an appellate court finds no errors exist, the cumulative error doctrine cannot apply.). Moreover, assuming one of the issues raised was in error, this fact would not trigger imposition of the cumulative error doctrine. See *State v. Ballou*, 310 Kan. 591, 617, 448 P.3d 479 (2019) (a single error cannot support reversal under the cumulative error doctrine). This issue is without merit.

SUFFICIENCY OF EVIDENCE

For his final argument on appeal, Kyando argues there was insufficient evidence to support the jury's verdict. He contends that even though he exceeded the speed limit while driving, speeding alone does not establish the level of recklessness to prove involuntary manslaughter. In response, the State highlights the myriad of driving behaviors that it asserts proves the recklessness of Kyando's conduct; including excessive speed in a residential area with heavy traffic, failure to keep a proper lookout, accelerating immediately prior to the collision, and an inability for eastbound motorists to see the oncoming intersection due to a hill a short distance west of the intersection.

25

"'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

A verdict may be supported by circumstantial evidence, if such evidence provides a basis for a reasonable inference by the fact-finder about the fact in issue. Circumstantial evidence, to be sufficient, need not exclude every other reasonable conclusion. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016).

To prove involuntary manslaughter, the State had to show that Kyando recklessly killed Salabao and Latney. See K.S.A. 2018 Supp. 21-5405(a)(1). "A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2018 Supp. 21-5202(j).

While Kyando "does not suggest there is a hard and fast rule that speeding alone can never constitute criminally reckless conduct," he claims "[t]he State has relied solely on Mr. Kyando's speeding to establish that he acted recklessly." Still, Kyando candidly concedes that "[i]t is clear that Mr. Kyando failed to anticipate that Ms. Salabao would attempt to turn left in front of him, when he had the green light. *Had he not been speeding, he may have been able to stop in time, or the damage may have been minor, rather than catastrophic*." (Emphasis added.) We agree.

Having reviewed all the evidence, as detailed in the Factual and Procedural Background section in a light most favorable to the State, we are convinced that a rational fact-finder could have found Kyando guilty beyond a reasonable doubt of two counts of

involuntary manslaughter. Considered together, the following substantial competent evidence established the recklessness of Kyando's driving:

- Speeding. In the 5 seconds before impact, Kyando was speeding 80 to 88 miles per hour in a 40 mile per hour zone in a residential area with traffic.
- Failure to apply brakes. In the last 5 seconds before impact, while Kyando was driving between 68 miles per hour to 88 miles per hour, Kyando did not apply the vehicle's brakes until about 1 second before impact. This failure is particularly noteworthy given that Kyando said he observed two other vehicles enter the intersection before observing Salabao enter the intersection, yet he did not appreciably reduce his speed or apply his brakes until a moment before impact.
- Failure to keep a proper lookout. A bridge overpass above the nearby turnpike created a hill for eastbound motorists, like Kyando, traveling towards the intersection. Despite the slope of the road which significantly impaired Kyando's view about 500 feet back of the intersection, Kyando continued to drive at an excessive speed upon his approach.
- Kyando admitted to being in a hurry to obtain a gas can at a gas station and return the Trailblazer to his girlfriend by 2:30 p.m. so she could go to work. The collision was called into the dispatcher at 2:25 p.m, suggesting that Kyando was going to be late.
- Kyando informed Sergeant Bray that he was a commercial truck driver who was familiar with the rules of the road and, thus, he would have training and experience in driving safely.

To support his claim, Kyando relies on *State v. Kellum*, No. 119,809, 2020 WL 1649934 (Kan. App.) (unpublished opinion), *rev. denied* 312 Kan. 897 (2020), and *State v. Krovvidi*, 274 Kan. 1059, 58 P.3d 687 (2002). But these cases are distinguishable because they relate to convictions for vehicular homicide, not involuntary manslaughter.

Another case cited by Kyando, *State v. Jenkins*, 272 Kan. 1366, 39 P.3d 47 (2002), involved a defendant who was convicted of two counts of involuntary manslaughter after the vehicle he was driving in excess of the speed limit struck the back of a vehicle stopped at a red light. This case is readily distinguishable because it focused on the fact that Jenkins, who had numerous prior accidents due to epileptic seizures, had another seizure immediately prior to the accident. These cases provide no support for Kyando's argument.

Having reviewed all the evidence in a light most favorable to the State, we are convinced that a rational fact-finder could have concluded that Kyando was guilty beyond a reasonable doubt of two counts of involuntary manslaughter.

Affirmed.